854 A.2d 401

Dawn ALBERT, d/b/a The Waverly Retreat

v.

ZONING HEARING BOARD OF NORTH
ABINGTON TOWNSHIP

North Abington Township

v.

Zoning Hearing Board of North Abington Township

Ernest J. D'Agata and Hollis D'Agata, his Wife and William D.
Donahoe and Mary Carroll Donahoe, his Wife and Charles
Curtain, M.D. and Judith Curtain, his Wife

v.

Zoning Hearing Board of North Abington Township.

Appeal of Ernest J. D'Agata and Hollis D'Agata, his Wife and
William D. Donahoe and Mary Carroll Donahoe, his Wife
and Charles Curtain, M.D. and Judith Curtain, his Wife.

165 M.D. Appeal Docket 2002.

Supreme Court of Pennsylvania.

Argued May 13, 2003.

Decided July 20, 2004.

Sandra D. Boyle, Esq., William A. Aileo, Esq., Nicholson, for North Abington Township.

Kevin Christopher Quinn, Esq., for Ernest, et al D'Agata.

Bruce Louis Coyer, Esq., Paul A. Barrett, Esq., Scranton, for Zoning Hearing Board of North Abington Township.

George E. Clark, Esq., Chinchilla, for Dawn Albert, d/b/a The Waverly Retreat.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice NIGRO.

This appeal raises the issue of whether the Commonwealth Court erred in granting a license for the operation of a halfway house for recovering alcoholics and drug-addicts in a residential zoning district based on its conclusion that the facility qualified as a "single-family detached dwelling" under the local zoning ordinance. For the following reasons, we conclude that it did err and therefore reverse.

On January 13, 2000, Dawn Albert filed a zoning application to operate a halfway house, known as The Waverly Retreat (the "Retreat"), on a 30–acre tract of land that she and her

siblings own in North Abington Township (the "Township"). The Township's zoning officer denied her application, concluding that the proposed use is not a permitted use in the R–1 Low Density Residential District (the "R–1 District") in which the property is located.

Albert appealed to the Township's Zoning Hearing Board ("ZHB"), and the ZHB held a public hearing on March 14, 2000. As the ZHB stated in its findings of fact, Albert testified at the hearing that "her goal was to establish . . . a sober, family-type residential environment for females . . . who had completed in-patient rehabilitation programs [for drug or alcohol abuse at other facilities]." ZHB Op. at 3; R.R. at 60a. Albert testified that she intended to accommodate between six and fifteen women at the Retreat and that there would be no limit on the length of a resident's stay, provided that the resident followed the Retreat's rules. R.R. at 67a; ZHB Op. at 5. That said, Albert also presented evidence that the average stay for a resident at the facility would be between two and six months. R.R. at 49a, 92a.

According to Albert, the Retreat would not offer "treatment," but would employ a supervisor or "housemother," who would "act as a head of the household in much the same way as a parent does in a family with children." R.R. at 64a–65a; ZHB Op. at 4. The housemother would "help plan and arrange for the activities of the group," would resolve disputes among the residents, and would enforce the rules of the Retreat. R.R. at 65a; ZHB Op. at 4. Albert testified that the housemother would also be responsible for meal planning, which would be served "family style" and would be "prepared by members of the group on a rotating basis." R.R. at 65a; ZHB Op. at 4–5. Together the residents would maintain the common areas of the residence, but each would be "responsible to maintain her own personal living space." R.R. at 65a; ZHB Op. at 5. A "substantial part of each day's activities" would be "devoted to addressing and solving common problems in addiction," and the residents would "meet frequently in small groups to discuss their common experiences." R.R. at 61–62; ZHB Op. at 5. Albert testified that the residents would pay

approximately $100 a day for residential services, but that the project was "not proposed as a profit-making enterprise." R.R. at 69a–70a; ZHB Op. at 12, 20. According to the ZHB, Albert "indicated that if the revenues derived from the payments by residents exceeded the expenses of the residents, she was prepared to make an appropriate pledge to a recreation or education program for the youth of the township." ZHB Op. at 20; *see also* R.R. at 70a. Nevertheless, the only evidence presented at the hearing regarding the Retreat's expected expenses was a lease showing that the Retreat would lease the property from the owners (Albert and her siblings) for $4,000 per month. *See* ZHB Op. at 3.

Based on the evidence adduced at the hearing, the ZHB reversed the decision of the zoning officer, concluding that the proposed use of the property was permitted under the local zoning ordinance because the Retreat qualified as a "single-family detached dwelling," a permissible use in the R–1 District. *See* North Abington Township Zoning Ordinance (the "Ordinance"), R.R. 419a. Accordingly, the ZHB approved the zoning permit, subject to a number of conditions, including that Albert operate the Retreat through a non-profit corporation. *See* ZHB Op. at 15; Trial Ct. Op. at 3.

On appeal, the trial court affirmed in part and reversed in part. Specifically, the trial court affirmed the granting of the application to operate the Retreat as a permitted use in the R–1 District based on its status as a "single-family detached dwelling," but struck down all of the conditions except the requirement that the facility operate through a non-profit corporation. Subsequently, the Commonwealth Court affirmed on the basis of the trial court opinion. *See North Abington Twp. v. Albert*, 787 A.2d 1135 (Pa.Cmwlth.2001) (Table). Appellants Ernest J. and Hollis D'Agata, William D. and Mary Carroll Donahoe, and Dr. Charles and Judith Curtin, all of whom are residents of a Township Development known as Grouse Hill, where the Retreat is to be located, sought allowance of appeal, contending that the Commonwealth Court should not have affirmed the grant of the permit application. We granted their Petition, *Albert v. Zoning*

*Hearing Bd. of North Abington Twp.*, 570 Pa. 700, 809 A.2d 905 (2002) (Table), and now reverse.[1]

The crux of Appellants' argument to this Court is that the Commonwealth Court erred by applying an over-inclusive definition of "family" in concluding that the Retreat qualifies as a "single-family detached dwelling" under the Ordinance. We agree.

Under the Ordinance, the principal permitted uses in the R–1 District are single-family detached dwellings; churches and parish houses; public parks and playgrounds; and agriculture. Ordinance § 3.111, R.R. 419a. A single-family dwelling is defined under the Ordinance as "a detached building, designated for or occupied exclusively by one *family* and containing not more than one dwelling unit." Ordinance § 11.122a (emphasis added), R.R. at 503a. Meanwhile, the Ordinance defines "dwelling unit" as "[o]ne (1) or more rooms, including a kitchen or kitchenette, and sanitary facilities in a dwelling structure, designed as a unit for occupancy by not more than one (1) *family* for living and sleeping purposes." [2] Ordinance § 11.124 (emphasis added), R.R. at 504a. In light of these definitions, the parties and the lower tribunals agree that whether or not the Retreat qualifies as a "single-family detached dwelling" ultimately turns on the meaning of "family," which the Ordinance does not define. That is, only if the residents of the Retreat are a "family" for purposes of the Ordinance can the Retreat qualify as a "single-family detached

1. The Township also filed a Petition for Allowance of Appeal, seeking review of certain discrete aspects of the Commonwealth Court's decision, but this Court denied that Petition. *See Albert v. Zoning Hearing Bd. of North Abington Twp.*, 572 Pa. 709, 813 A.2d 844 (2002) (Table).

2. "Dwelling Structure," in turn, is defined as "[a]ny structure which shall contain one (1) or more dwelling units, not including a hotel, hospital, nursing home, dormitory, fraternity or sorority house, rooming house or boarding house." Ordinance § 11.123, R.R. at 503a. Finally, "Rooming House" is defined as "[a] building containing a single dwelling unit and rooms for the rooming and/or boarding of between three (3) and ten (10) persons, by pre-arrangement for a definitive period of not less than one (1) week." Ordinance § 11.151, R.R. at 509a.

dwelling" and thereby obtain a permit to operate in the R–1 District.

In addressing the proper interpretation of "family" as used in the Ordinance, the ZHB initially noted that "a permitted use must be afforded the broadest interpretation so that land owners may have the benefit of the least restrictive use in enjoyment of their land." ZHB Op. at 7 (quoting *Human Consultants Services, Inc. v. Butler Twp.*, 137 Pa.Cmwlth. 594, 587 A.2d 40, 42 (1991)). With that standard in mind, it briefly canvassed cases in this Commonwealth which have addressed the meaning of "family" in zoning ordinances. The ZHB began with this Court's decision in *Appeal of Miller*, 511 Pa. 631, 515 A.2d 904 (1986), which it cited as establishing the proposition that "a group of persons need not be related by blood or marriage to constitute a family." ZHB Op. at 7. It then cited to a series of Commonwealth Court decisions holding that (1) a zoning ordinance defining family to exclude foster children was unconstitutional, because a foster family is the functional equivalent of a biologically-related family, *see id.* at 7–8 (citing to *Children's Home v. City of Easton*, 53 Pa.Cmwlth. 216, 417 A.2d 830, 832 (1980)), (2) a husband and wife housing three mentally retarded children pursuant to a Department of Public Welfare program constituted a family, *see id.* at 8 (citing to *Hopkins v. Zoning Hearing Bd. of Abington Twp.*, 55 Pa.Cmwlth. 365, 423 A.2d 1082 (1980)), (3) four unrelated adult mentally retarded women and a ten-person support staff constituted a family, *see id.* at 8–9 (citing to *JALC Real Estate Corp. v. Zoning Hearing Bd. of Lower Salford Twp.*, 104 Pa.Cmwlth. 605, 522 A.2d 710 (1987)), and (4) three mentally retarded residents in a supervised, residential home atmosphere with one resident staff member constituted a family.[3] *See id.* at 8 (citing to *Philadelphia Center v. Zoning Hearing Bd. of Plymouth Twp.*, 89 Pa.Cmwlth. 591, 492 A.2d 1191, 1193 (1985)). The ZHB then concluded that "the residents of the . . . proposed Waverly Retreat would in

---

3. All four of the zoning ordinances at issue in these cases contained definitions of "family," which essentially defined the term as a "single housekeeping unit."

fact meet the definition of a 'family' under the various case law decisions in cases with similar factual settings and similar ordinances." ZHB Op. at 14. On appeal, the trial court affirmed, incorporating into its opinion large portions of the ZHB's opinion. *See* Trial Ct. Op. at 7–10. The Commonwealth Court also affirmed, stating that the issues were "thoroughly and correctly analyzed in the comprehensive and well-reasoned opinion of the trial court." Commw. Ct. Op. at 8.

■■■ Appellants now contend that all three of the lower tribunals erred in failing to credit their two primary arguments as to why the residents of the Retreat could not be deemed a "family," namely, that both Albert's "clear profit motive" and the short-term stays of the Retreat residents are not qualities consistent with a traditional "family."[4] Appellants' Brf. at 13. In considering these arguments, this Court must determine whether the ZHB committed an error of law or a manifest abuse of discretion. *See C & M Developers, Inc. v. Bedminster Twp. Zoning Hearing Bd.*, 573 Pa. 2, 820 A.2d 143, 150 (2002) (articulating standard of review where trial court has taken no additional evidence); *Patricca v. Zoning Bd. of Adjustment*, 527 Pa. 267, 590 A.2d 744, 746 (1991) (same). An abuse of discretion will be found only where the ZHB's findings are not supported by substantial evidence. *See Hertzberg v. Zoning Bd. of Adjustment*, 554 Pa. 249, 721 A.2d 43 (1998). Moreover, in conducting our review, we must keep in mind that zoning ordinances are to be liberally construed and interpreted broadly to permit a landowner the broadest possible use of her land. 53 P.S. § 10603.1; *Southco, Inc. v. Concord Twp.*, 552 Pa. 66, 713 A.2d 607, 609 (1998).

This Court addressed the meaning of "family" in the context of a zoning ordinance in *Appeal of Miller*, 511 Pa. 631, 515

---

4. Appellants also argue that the Retreat should not qualify as a "single-family detached dwelling" because it will have a "therapeutic or corrective purpose." *See* Appellants' Brf. at 20–21. However, Appellants did not raise this argument in their Petition for Allowance of Appeal, but rather addressed only the Retreat's purported profit motive and transient nature. Accordingly, we did not grant allocatur to consider the Retreat's alleged "therapeutic or corrective purpose" and will not address Appellants' argument in that regard here.

A.2d 904 (1986). In that case, Irene C. Miller, a homeowner in a zoning district permitting single-family dwellings, took into her house seven boarders, all of whom were either elderly or handicapped and none of whom were related to her by blood or marriage. When the township zoning officer ordered Miller to cease such use of the property, declaring that it was not a permitted "single-family" use, Miller appealed to the township's Zoning Board of Adjustment (the "Board"). However, the Board agreed with the zoning officer that the residents of the home did not constitute a "family" under the terms of the relevant township ordinance, which defined "family" as "any number of persons living and cooking together as a single housekeeping unit." Specifically, the Board reasoned that the residents were not a "family" because the boarders either paid money or rendered services for their room and board, and because "the membership of the group was subject to periodic change." *Id.* at 906. The trial court and the Commonwealth Court subsequently affirmed.

The question before this Court on appeal was therefore whether the lower tribunals had erred in concluding that the household did not constitute a "family," *i.e.,* a "single housekeeping unit," so as to qualify the home as a single-family dwelling under the applicable zoning ordinance. In concluding that the lower tribunals had, in fact, erred, this Court explained that a "single housekeeping unit" is one which "functions in the manner of a family residence," *id.* at 908, and noted that there was substantial evidence presented before the Board to establish that Miller's home was a "caring familial unit." *Id.* Specifically, this Court stated that

> The individuals lived and cooked together as a single housekeeping unit. The same furnishings were throughout the house and the activities of the home were shared in by all occupants. Each occupant had access to all areas of the premises. There was only one kitchen, the meals were taken by all as a group in one sitting. The group attended social and religious functions together and celebrated holidays jointly. Ms. Anne Henry, a clinical psychologist, testified

> I guess my biggest impression was a boarding house—I figured was [sic] a big house and all these people would be wandering around not knowing anybody. I was very much impressed like I was going into a person's family. There is a lot of caring and sharing, and it is a really nice experience to visit there. Record p. 105.

515 A.2d at 908.

The Court went on to note that in spite of this evidence, the Board had concluded that the home was a "commercial establishment for which [the homeowner] received income and provided services," rather than a "family," solely because the residents paid Miller $200 per month for their room and board. *Id.* This Court rejected that reasoning, explaining

> This [$200 per month] rate, particularly in view of the special care these residents require, does not suggest a profit motive. We also note that foster children are subsidized by public funds, and that fact has not been determinative of whether the living arrangement constituted a family unit. Similarly, in family units based upon blood and marital relationships the adult members quite frequently contribute to the maintenance of the unit. The mere fact that a member of the unit pays a fee for belonging to the unit does not transform the relationship unless it also appears that the profit motive is the basis for the relationship.

*Id.* at 908–09.

This Court likewise rejected the Board's rationale that the "lack of permanency" of the residents supported the conclusion that the household was not a "single housekeeping unit." *Id.* at 909. While noting that the record reflected that only one of the residents had been living at the home for eight years or more, this Court stated that "it is clear that this is not a transient establishment but rather that the residents usually remain for substantial periods of time and move only for health reasons or personal preference." *Id.* The Court further commented that "the focus for this purpose should be directed to the quality of the relationship during the period of residency rather than its duration." *Id.*

Based on the foregoing analysis, this Court concluded that Miller's home constituted a "single-family dwelling" under the terms of the ordinance at issue, in spite of both the monthly fee paid by the residents and the fact that only one resident had been living at the residence of eight years or more. Appellants now advance the same basic arguments that we rejected in *Miller*, but contend that the facts here are more compelling than those in *Miller* and thus, warrant a different conclusion.[5] While we reject Appellants' argument that the

**5.** North Abington Township, which filed a brief in support of Appellants, and Appellee Zoning Hearing Board of North Abington Township suggest that our interpretation of the term "family" in *Miller* does not control here, because the ordinance at issue in that case specifically defined "family" as a "single housekeeping unit" whereas "family" in the Ordinance at issue here is undefined. Appellants, on the other hand, take the position that *Miller's* analysis is applicable here, and we agree.

As we explained in *Miller*, when townships throughout the country first started creating single-family zoning districts, they left the term "family" undefined, leaving the resolution of its meaning to the courts. 515 A.2d at 906–07. When that approach created uncertainty and spurred significant litigation, townships began to define the term. *Id.* at 907. The "essential element" of the resulting definitions was that the occupants live together as a "single housekeeping unit." KENNETH H. YOUNG, 2 ANDERSON'S AMERICAN LAW OF ZONING § 9:30 (4th ed.1996); *see also supra* n. 3 and accompanying text; *Miller*, 515 A.2d at 907. The prevalence of this construction, in combination with the principle that zoning ordinances should be liberally construed to permit the broadest possible use of land, 53 P.S. § 10603.1, makes it apparent that "single housekeeping unit" must be considered the plain and ordinary meaning of "family" in the zoning context. *See Southco, Inc.*, 713 A.2d at 609 ("[W]hen interpreting zoning ordinances, words not defined in the ordinance are to be construed in accordance with their plain and ordinary meaning."); *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 4TH ED. (2001) (defining "family" as "a group of individuals living under one roof and [usually] under one head: HOUSEHOLD"). We therefore conclude that the Township, by declining to define "family," has communicated its intent to have that term include any group living together as a "single housekeeping unit," making *Miller's* analysis wholly applicable here. *See Bailey v. Zoning Bd. of Adjustment*, 569 Pa. 147, 801 A.2d 492, 502 n. 19 (2002) ("When interpreting the meaning of municipal ordinances, we are guided by the principles of statutory construction."); 1 Pa.C.S. § 1921 ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.").

We feel compelled to emphasize that, as *Miller* recognized, the members of a "single housekeeping unit" need not be related by blood or marriage. 515 A.2d at 907; *see also* EDWARD H. ZEIGLER, JR. ET AL., 2

facts of this case support a finding that the Retreat has a profit motive that is incompatible with the concept of "family," we nevertheless agree that the Retreat cannot qualify as a "single-family detached dwelling" under the Ordinance in light of the transience of its residents, and therefore hold that the Commonwealth Court erred in granting the Retreat its requested license.

In connection with their profit motive argument, Appellants point to *Miller's* statement that "the mere fact that a member of the unit pays a fee for belonging to the unit does not transform the relationship *unless it also appears that the profit motive is the basis for the relationship.*" *Id.* at 908–09 (emphasis added). Applying that rationale here, Appellants argue that the lower tribunals should have concluded that the members of the Retreat do not qualify as a "family" under the North Abington Ordinance because, unlike the situation in *Miller,* the record evidence in the instant case suggests that there may be a "profit motive [that] is the basis for the relationship." [6] *Id.* at 908. In support of this assertion, Appellants note that while Albert professes to be planning to operate the Retreat as a non-profit entity, this stated intention "does not mean that Ms. Albert does not have a profit motive

RATHKOPF'S THE LAW OF ZONING AND PLANNING § 3:14 (4th ed. 2003) ("Courts have interpreted [single-housekeeping unit] in a rather elastic way, generally ruling that any living arrangement which makes use of unified housekeeping facilities satisfies such an ordinance."). Accordingly, local legislatures that have wished to place relational restrictions on "families" have had to do so explicitly. *See, e.g., Appeal of Lynch Community Homes, Inc.,* 123 Pa.Cmwlth. 278, 554 A.2d 155, 156 n. 2 (1989) (ordinance defining "family" as "any number of individuals living and cooking together as a single housekeeping unit, provided that not more than two (2) of such number are unrelated to all of the others by blood, marriage or legal adoption"); *Act I, Inc. v. Zoning Hearing Board,* 704 A.2d 732, 734 (Pa.Commw.1997) (ordinance stating that "family shall not include more than 4 persons who are not related to each other by blood, official foster relationship, marriage or adoption"). Significantly, North Abington Township has taken no steps to limit the prevailing meaning of "family" to exclude certain combinations of individuals who are not related by blood or marriage. Accordingly, no such restrictions apply here.

**6.** Significantly, Appellants stop short of asserting that the record evidence actually establishes that the Retreat would generate a profit.

in mind for the [Retreat]." Appellants' Brf. at 20 n. 6.
Appellants emphasize that Albert testified and introduced
evidence at the ZHB hearing that she intended to charge each
of the residents of the Retreat somewhere between $2,000 and
$3,000 per month, for a total monthly intake at full capacity of
anywhere between $30,000 and $45,000. Meanwhile, Appel-
lants point out that the Retreat will pay just $4,000 per month
to lease the property from Albert and her siblings. Appel-
lants acknowledge that rent will not be the only expense in
operating the Retreat, but note that there was no evidence
presented to the ZHB regarding any additional monthly ex-
penses.

Despite these assertions, we do not believe that our concern
in *Miller* regarding profit-driven enterprises is even implicat-
ed here, because the record simply does not support the
conclusion that a profit motive would be the basis for the
Retreat's relationships. As an initial matter, Ms. Albert spe-
cifically testified at the ZHB hearing that she did not propose
the project as a profit-making enterprise. R.R. at 70a. She
further testified that she was "prepared to make an appropri-
ate pledge to recreational or educational youth of the town-
ship" if the Retreat ultimately did turn a profit. *See id.*
Moreover, when Appellants nevertheless urged the ZHB to
deny the Retreat its permit in light of the *possibility* that it
would earn a profit, the ZHB responded by explicitly condi-
tioning the permit on the Retreat's organizing as a nonprofit
corporation, which, according to Pennsylvania's Nonprofit Cor-
poration Law, means that it may not have a "purpose involv-
ing pecuniary profit, incidental or otherwise." 15 Pa.C.S.
§ 5103 (defining "Corporation not-for profit"). Given these
facts, the ZHB did not abuse its discretion in failing to
conclude that the Retreat was a profit-motivated enterprise
that rendered its occupants something other than a "family"
for purposes of the zoning requirements.[7] In sum, we agree

7. In concluding as such, we necessarily reject Appellants' assertion that
we must find the Retreat to be profit-driven because it would be
impossible for the Retreat *not* to generate a substantial profit when it
will charge residents between $2,000 and $3,000 per month while
paying just $4,000 per month in rent. Certainly, the $30,000–$45,000

with the lower courts that the evidence, taken as a whole, does not suggest a profit motive that is incompatible with a traditional family setting, and thus, we reject Appellants' argument that *Miller* dictates that the Retreat's application should have been denied on that basis.[8]

■ Appellants next argue that the three lower tribunals erred in rejecting their argument that the Retreat should not be considered a "single-family detached dwelling" because, unlike the members of a traditional family, the Retreat residents will come and go on a transient basis. We agree that the lower tribunals erred in this regard and thus reverse the order of the Commonwealth Court on that basis. While this Court has never before explicitly stated that transiency is incompatible with the notion of a single-family household, it is undeniable that inherent in the concept of "family" and, in turn, in the concept of a "single-family dwelling," is a certain expectation of relative stability and permanence in the compo-

that the Retreat expects to collect per month at full capacity is a substantial sum, but Albert explained that she had estimated the Retreat's expenses based on discussions with not only her accountants, but also representatives of other similar facilities, which charge their residents between $2,000 and $4,000 per month. R.R. at 87a. Moreover, Albert's attorney explained at the hearing that before opening, the Retreat would have to invest at least $50,000 to refurbish the existing facilities and that using the $2000 per month figure, the Retreat expected to *lose* money until it had at least ten residents. R.R. at 85a–86a; 88a. Finally, Albert made clear that the amount she would charge the residents was not set in stone. R.R. at 87a. As she explained, until the Retreat began operating and incurring daily expenses, she could not state with certainty how much income it would need to break even. R.R. at 87a–88a; *see also* R.R. at 84a–85a (representations of Albert's counsel). Under these circumstances, this Court cannot simply presume that the Retreat will generate a profit, and certainly has no basis on which to conclude that it is explicitly profit-driven.

8. We also reject Appellants' alternative argument, buried in a footnote in their brief, *see* Appellants' Brf. at 20 n. 6, that we remand the case for the development of a more detailed record regarding the Retreat's expected expenses and income. Simply put, the mere fact that residents will likely pay substantial sums to stay at the Retreat does not, in and of itself, require that this Court remand the case for more evidence, when other record evidence makes clear that a profit motive is not the basis for the relationships at issue. *Cf. Eichlin v. Zoning Hearing Bd. of New Hope Borough*, 671 A.2d 1173 (Pa.Commw.1996) (payment of rent "is not conclusive of a profit motive").

sition of the familial unit. *See, e.g., Open Door Alcoholism Program, Inc. v. Bd. of Adjustment of City of New Brunswick,* 200 N.J.Super. 191, 491 A.2d 17, 21–22 (1985) ("[I]n order for a group of unrelated persons living together as a single housekeeping unit to constitute a single family in terms of a zoning regulation, they must exhibit a kind of stability, permanency and functional lifestyle which is equivalent to that of the traditional family unit."); *see also City of White Plains v. Ferraioli,* 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756, 758 (1974) ("So long as a group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance."); *Planning and Zoning Comm'n of the Town of Westport v. Synanon Foundation, Inc.,* 153 Conn. 305, 216 A.2d 442, 443 (1966) (concluding that "ever-changing" group of individuals who slept, cooked, ate, worked, and carried on activities in a dwelling did not come within the meaning of the word "family.") Indeed, one of the many benefits of single-family zoning districts is that they create residential neighborhoods in which the residents may develop a sense of community and a shared commitment to the common good of that community. Without some level of stability and permanence in the composition of the groups residing in such residential districts, this goal is necessarily subverted. *See, e.g.,* 2 RATHKOPF'S THE LAW OF ZONING AND PLANNING § 23.27 ("Many courts have used a so-called 'functional family' standard . . . by considering whether the group possesses a family-like structure of household authority, *functions as a relatively stable* and integrated *housekeeping unit,* and whether the living arrangement is consistent with or likely to impact negatively the residential character of the neighborhood.") (emphasis added). Accordingly, we conclude that in order to qualify as a "single housekeeping unit," a group of individuals in a single household must not only function as a family within that household, but in addition, the composition of the group must be sufficiently stable and permanent so as not to be fairly characterized as purely transient.

Applying this standard to the case at hand, it is apparent that the Retreat cannot qualify as a "single housekeeping unit." Far from being a relatively stable and permanent assemblage, the residents of the Retreat will change on a fairly regular basis. In fact, the entire premise of the Retreat is to lodge its residents for only so long as is necessary to prepare them to return to their own families. *See* ZHB Op. at 12 (describing Retreat's proposed use as a "sober residential environment for fifteen, *transient* unrelated adults ....") (emphasis added); R.R. 49a–50a (a transitional living facility "is not an end place," but rather, its residents "move though [it] to get home" to their families). Thus, the average stay for a resident at the facility is expected to be just two to six months, *see* R.R. at 49a, 92a, and, as a result, the Retreat's entire population of six to fifteen women could turn over as many as six times a year. This level of instability and transience is simply incompatible with the single-family concept. *Accord Open Door*, 491 A.2d at 22 (finding that where the average stay of alcoholics in a halfway house was six months, the residents' affiliation with one another would be no different than if they were fellow residents of a boarding house, and thus the group did not possess the elements of stability and permanency associated with single-family occupancy); *see also Act I, Inc.*, 704 A.2d at 735 (group home in which the residents' average stay was between eight and nine months did not have the same "general character" as a single family dwelling because the arrangement was too "transient"); *Lakeside Youth Service v. Zoning Hearing Bd. of Upper Moreland Twp.*, 51 Pa.Cmwlth. 485, 414 A.2d 1115, 1116 (1980) ("We agree with the [trial court] that in view of the numbers of people entering and leaving the house and the transient nature of the principal residents that 'the basic social structure of the proposed use is simply too far removed from the ordinance's concept of 'single family dwelling' to be considered of 'the same general character' of that use.").

We recognize that there is language in *Miller* suggesting that the focus of the "family" inquiry "should be directed to the *quality* of the relationship during the period of residency

rather than its *duration.*" *Id.* (emphasis added). However, we regard this language as dicta, not a controlling holding. In fact, in reversing the Board's holding that the *Miller* household was too transient to qualify as a family, *id.* at 906, the *Miller* court specifically stated that the Board's characterization of the household as transient was unjustified, because "it is clear that [the *Miller* household] is *not* a transient establishment but rather that the residents usually remain substantial periods of time and move only for health reasons or personal preference." *Id.* at 909. As such, this Court made clear that transience was simply not an issue in that case and thus, its subsequent commentary that the duration of residency is secondary to the quality of the relationship was nonbinding dicta that need not influence our analysis here.

In sum, we hold that the Commonwealth Court did not err in failing to find that the Retreat had a profit motive that was incompatible with the single family concept, but did err insofar as it failed to credit Appellants' argument that the Retreat could not qualify as a "single-family dwelling" because of the transient nature of its residents. Accordingly, we reverse the order of the Commonwealth Court.

Former Justice LAMB did not participate in the decision of this case.