# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Hope House in Midland PA,       :
A Non-Profit Corporation,       :
                     Appellant  :
                         :  No.  145 C.D. 2022
          v.              :  Argued:  October 11, 2022
                         :
Borough of Midland, PA,       :
A Municipal Corporation      :

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE STACY WALLACE, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WALLACE                    FILED:  November 7, 2022

Hope House in Midland PA (Hope House) appeals from the January 25, 2022 order of the Court of Common Pleas of Beaver County (Common Pleas) denying Hope House's appeal of the decision of the Borough of Midland, PA Council (Borough), which denied Hope House's request for a curative amendment to Borough's Zoning Ordinance (the Ordinance)[1] to define and allow community living arrangements as permitted uses in R-1 Zoning Districts.  Upon review, we affirm.

## I.     Background

The Ordinance identifies Borough's various zoning districts, which include three separate residential districts: R-1 Single Family, R-2 Two Family, and R-3

---

[1] Borough of Midland, Pa., Zoning Ordinance (1989), *as amended*.

Multi-Family. Reproduced Record (R.R.) at 163a, 166a (Ordinance, § 201, Table 201). The Ordinance also identifies various permitted uses, conditional uses, and other requirements for properties in each zoning district. *Id.* at 166a. The Ordinance allows accessory uses, single-family dwellings, and parks and recreation as permitted uses in R-1, R-2, and R-3 districts. *Id.* The Ordinance also allows two-family dwellings as permitted uses in R-2 and R-3 districts. *Id.* In R-3 districts, which are the least restrictive, the Ordinance also allows garden apartments and townhouses as permitted uses. *Id.* Similar to permitted uses, R-3 districts are the least restrictive districts for conditional uses. *Id.* One of the conditional uses that the Ordinance only allows in R-3 districts is a group dwelling. *Id.*

The Ordinance defines "single-family house" as "a detached building having accommodation for and occupied by not more than one (1) family." R.R. at 203a (Ordinance, § 601). The Ordinance defines "family" as "either an individual, or two (2) or more persons related by blood or marriage or adoption, or a group of not more than five (5) persons not so related (not counting servants) occupying a premises and living as a single housekeeping unit as distinguished from a group occupying a boarding house, lodging house, club, fraternity or hotel." *Id.* at 199a. The Ordinance defines "group residence" as "a dwelling facility operated for not more than fifteen (15) persons plus staff, living together as a single family or as a single housekeeping unit." *Id.* at 200a. The Ordinance also provides specific requirements for a group residence as a conditional use, as follows:

> Group residences and intermediate care facilities shall be at least five hundred (500) feet apart from each other, shall not be located on lots of less than six thousand (6,000) square feet, nor on lots having less than four hundred (400) square feet for every sleeping room or for every two (2) beds, whichever is greater. Such uses shall have side yards of not less than ten (10) feet, and shall not be approved unless plans prepared by an architect or engineer are submitted which clearly indicate that

2

adequate light, ventilation and fireproofing are provided, and that the dwelling facility and its accommodations shall be functional and convenient with regard to the specific needs of the group to be housed in the facility. Group residences and intermediate care facilities shall be approved only after Council has found that plans and programs for management of the group residence or facility are adequate and appropriate to the population to be housed and that adequate provisions have been made to assure the safety and welfare of the residents of the facility and of the adjacent neighborhood.

R.R. at 179a (Ordinance, § 401(M)).

Hope House is a nonprofit organization whose mission is to "empower women who need resources, shelter and hope in Christ." R.R. at 61a. In December 2020, Hope House purchased a six bedroom, two and one-half bath home located at 117 7th Street, Midland (Property), which is located in one of Borough's R-1 districts. *Id.* at 61a-62a, 82a. Hope House's Executive Director, Mandy Baker (Baker), stated that Hope House wants to use the Property to "basically . . . operate a shelter for women and children who need housing," and that they would like to have up to 17 people, including 1 staff member, residing at the Property. *Id.* at 61a, 62a, 65a.

Hope House formally submitted a proposed curative amendment[2] (Curative Amendment), which, if approved by Borough, would modify the Ordinance to

---

[2] Section 916.1(a)(2) of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, provides that one way a landowner can "challenge the validity of an ordinance or map . . . which prohibits or restricts the use or development of land . . . [is] by submit[ting] the challenge . . . to the governing body . . . together with a request for a curative amendment . . . ." 53 P.S. § 10916.1(a)(2). The landowner's application to the governing body for a curative amendment must contain a "written request" for a hearing and "plans and explanatory materials describing the use or development proposed by the landowner in lieu of the use or development permitted by the challenged ordinance or map." 53 P.S. § 10916.1(c)(1). The governing body must then hold a hearing on the proposed amendment within 60 days. Section 609.1 of the MPC, added by the Act of June 1, 1972, P.L. 333, 53 P.S. § 10609.1(a).

include a "Community Living Arrangement" as a permitted use in R-1 districts. R.R. at 150a. The Curative Amendment proposed the following definition:

> Community Living Arrangement means any residence, whether operated for profit or not, that undertakes through its ownership or management to provide or arrange for the provision of daily personal housing, social or rehabilitative services, counseling, support, care or treatment exclusively for two (2) or more handicapped or disabled persons, including dependent children, not to exceed seventeen (17) total residents who are not related to the owner or administrator by blood or marriage and whose residential services are financially supported, in whole or in part, by the owner, administrator and/or the resident. Twenty-four (24) hour supervision by qualified staff shall be provided. The terms handicapped and disabled as used in this section include the definitions of those terms under State and Federal statutory and caselaw including, but not limited to, the Fair Housing Amendments Act and the Americans with Disabilities Act, and do not include individuals who require hospitalization.

R.R. at 150a.

Borough held a public hearing on the Curative Amendment on May 13, 2021. R.R. at 52a. Baker testified regarding Hope House's proposed use of the Property and stated that Hope House will provide residents with biblical counseling and classes in discipleship, workforce development, financial management, and household management during their time at Hope House. *Id.* at 69a. If residents need additional services, Hope House will refer them to other community programs. *Id.* Although Hope House does not have a limit for how long residents can stay there, Baker stated she expects residents will stay for an average of four to five months. R.R. at 68a. Thus, Baker acknowledged that Hope House would qualify as transitional housing. R.R. at 97a.

Although Hope House is not limited to individuals with disabilities, Baker stated that she "anticipate[s] that [Hope House's] guests will deal with some mental

4

illness possibly, they will be in recovery from addictions, could have learning disabilities as well as physical disabilities in terms of mobility and those kinds of things, hearing, sight issues. So just a wide variety of individuals." *Id.* at 62a-63a, 65a. Baker also stated that Hope House plans to give each family its own private bedroom, with the exception of single women, who would share one bedroom. *Id.* at 63a. All residents would share common living areas, including the living room, dining room, kitchen, laundry facilities, bathrooms, and backyard. *Id.* at 62a, 64a.

Baker explained that Hope House will perform rapid screenings before accepting new residents, and that Hope House would not accept residents unless they are drug and alcohol free and do not have prior convictions for sexual offenses. R.R. at 66a, 96a. Baker admitted that the Curative Amendment did not require any state licensure or certification, nor did it require minimum parking, bathroom facilities, space per person, or security measures. R.R. at 98a-103a.

Baker further explained that she reviewed the Ordinance and did not believe Hope House's proposed use of Property was permitted in any of Borough's zoning districts. R.R. at 85a. As a result, Baker contacted various Borough representatives to discuss Hope House's proposed use. *Id.* at 76a-84a. Baker informally submitted requests to Borough for approval of Hope House's proposed use. *Id.* at 79a. Borough did not approve Hope House's proposed use, however, so Hope House filed the proposed Curative Amendment. R.R. at 80a-82a, 150a.

Owen Pella (Pella), who has been the Borough's code enforcement officer for the past five years, testified on behalf of Borough. R.R. at 117a. He opined that Hope House's desired use qualifies as a "group residence," which is a conditional use in R-3 districts, because Hope House's residents would be living as a single housekeeping unit. R.R. at 121a-23a, 131a. Although the Ordinance does not define

5

"single housekeeping unit," Pella's interpretation of the term and his knowledge of Hope House's desired use led him to conclude that Hope House's residents would be living as a single housekeeping unit. *Id.*

Pella stated that there are four sections of Borough that are designated as R-3 districts. *Id.* at 123a. Those four R-3 districts contain a combination of houses, apartments, multi-family dwellings, and apartment complexes. *Id.* at 124a. Unlike properties in Borough's R-1 districts, properties in Borough's four R-3 districts have parking lots and off-site parking "to accommodate the extra cars that come with a multi-family dwelling." *Id.* at 124a.

Pella explained that Section 401(M) of the Ordinance establishes specific criteria for the approval of group residences as conditional uses in R-3 districts and permits Borough to review health and safety issues before approving a group residence as a conditional use. *Id.* at 121a, 125a. If Borough were to amend the Ordinance to make community living arrangements permitted uses in R-1 districts, a landowner could open a community living arrangement in an R-1 district without having to apply to Borough or comply with Borough's health and safety regulations for group residences. *Id.* at 126a.

Borough's Planning Commission reviewed the Curative Amendment and provided its opinion to Borough via letter dated April 30, 2021. R.R. at 153a-54a. In that letter, Borough's Planning Commission opined that the Curative Amendment was too broad and that a community living arrangement should be classified as a conditional use instead of a permitted use. *Id.* at 153a. Borough's Planning Commission explained that by making a community living arrangement a conditional use, Borough would have additional oversight and could create regulations to ensure safe living conditions for residents. *Id.* Borough's Planning

6

Commission also opined that "many of these regulations are currently in place in [the Ordinance] under Section 401(M) regarding approval for a Group Residence in the R-3 Zoning District." *Id.*

Borough denied the Curative Amendment. On July 7, 2021, Hope House timely appealed[3] Borough's denial to Common Pleas. Common Pleas reviewed the record of the proceedings before Borough and heard the parties' oral arguments. Thereafter, via order dated January 25, 2022, Common Pleas denied Hope House's appeal. Hope House timely appealed to this Court.

## II. Analysis

On appeal, Hope House advances a variety of arguments as to why Borough improperly denied the Curative Amendment, each of which relies upon the assertion that the Ordinance is exclusionary because it does not allow Hope House's proposed use in any zoning district. Borough asserts many grounds for denying Hope House's arguments, each of which relies upon the assertion that the Ordinance is not exclusionary because it does allow Hope House's proposed use. Accordingly, before we analyze Hope House's various arguments, we must first determine if the Ordinance excludes Hope House's proposed use.

The parties' disagreement revolves around whether Hope House's proposed use qualifies as a "group residence." The Ordinance provides that a "group residence"[4] is a conditional use in R-3 districts, and the Ordinance defines a "group

---

[3] Hope House alleges that it appealed from a deemed denial due to Borough's failure to mail its decision to Hope House within 45 days of the hearing date. *See* 53 P.S. § 10916.1(c)(7). We need not address whether Borough's written denial was timely, because Hope House's appeal was timely filed from either a deemed denial or the actual, written denial.

[4] Many of the terms used in Table 201 of the Ordinance (which identifies permitted and conditional uses in each zoning district) are not identical to the terms used in Section 601 of the **(Footnote continued on next page…)**

7

residence" as "a dwelling facility operated for not more than fifteen (15) persons plus staff, **living together** as a single family or **as a single housekeeping unit.**" R.R. at 200a (emphasis added). Borough asserts that Hope House's proposed use qualifies as a "group residence," because its residents will be living together as a single housekeeping unit. Borough acknowledges that the Ordinance does not define "single housekeeping unit," and that the Ordinance does not otherwise provide for Hope House's proposed use. Hope House asserts that its residents will not be living as a single housekeeping unit, because the term single housekeeping unit precludes purely transient uses.

Hope House has presented a de jure exclusion claim, as Hope House alleges that the Ordinance, on its face, totally excludes its proposed use of the Property. *See Bloomsburg Indus. Ventures, LLC v. Town of Bloomsburg*, 242 A.3d 969, 978 (Pa. Cmwlth. 2020) (citations omitted). "When a proposed use can be considered within another zoning classification or, where the zoning ordinance is broad enough to encompass the proposed use, there is no de jure exclusion." *Kratzer v. Bd. of Supervisors of Fermanagh Twp.*, 611 A.2d 809, 812 (Pa. Cmwlth. 1992) (citation omitted). In addition, "an ordinance which allows a use conditionally . . . is not de jure exclusionary." *Id.* at 814 (citations omitted).

"In examining whether a proposed use is covered by an ordinance, 'we are mindful that ordinances are to be construed expansively, affording the landowner the broadest possible use and enjoyment of his or her land.'" *Hatboro Borough v.*

---

Ordinance (definitions). For instance, Table 201 of the Ordinance permits a "single family dwelling" in all residential districts and a "group dwelling" as a conditional use in R-3 districts. Section 601 of the Ordinance does not define either of these terms, but it does define "single-family house" and "group residence." Although not identical, "house" and "residence" are synonymous with "dwelling," and we, like Common Pleas, attribute the definitions in Section 601 of the Ordinance to the synonymous terms found in Section 201 of the Ordinance.

*Buckingham Retail Properties, LLC*, 245 A.3d 728, 737 (Pa. Cmwlth. 2020) (citation omitted). Still, "a party challenging the lawfulness of an ordinance bears a heavy burden as an ordinance is presumptively valid and constitutional." *Bloomsburg*, 242 A.3d at 978 (citation omitted). "While the Statutory Construction Act[5] does not specifically apply to our construction of zoning ordinances, we have nonetheless applied [statutory construction] principles in our interpretive decisions." *Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 207 A.3d 886, 899 (Pa. 2019) (citation omitted). "Thus, undefined words and phrases that appear in a zoning ordinance are to be given their 'plain and ordinary meaning.'" *Id.* "When interpreting the meaning of a zoning ordinance, . . . [our] primary objective [is] determining the intent of the legislative body that enacted the ordinance." *Bloomsburg*, 242 A.3d at 979 (citation omitted).

"The issue of whether a proposed use falls within a given category of permitted use in a zoning ordinance is a question of law, subject to this Court's review." *Caln Nether Co., L.P. v. Bd. of Supervisors of Thornbury Twp.*, 840 A.2d 484, 491 (Pa. Cmwlth. 2004). Courts examine whether an ordinance is exclusionary using a two-step analysis:

> [W]e first consider whether the challenging party has overcome the presumed constitutionality of an ordinance by showing it excludes [the proposed use] as a use. If we determine the challenger has done so, we then consider whether the municipality has salvaged the ordinance by presenting evidence to show that the exclusionary regulation bears a substantial relationship to the public health, safety, morality, or welfare.

*Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, 962 A.2d 653, 661 (Pa. 2009).

With these principles in mind, we now turn to interpreting the contested language in this matter to determine if the Ordinance excludes Hope House's

---

[5] Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501-1991.

proposed use. In *In re Appeal of Miller*, 515 A.2d 904 (Pa. 1986), our Supreme Court evaluated whether a local zoning ordinance permitted a woman who owned a home in a single-family zoning district to have seven boarders, who were not her relatives, reside in her home. *Id.* at 905. Under the local zoning ordinance, "family" was defined as "any number of persons living and cooking together as a **single housekeeping unit**." *Id.* (emphasis added). The evidence presented indicated that the individuals living in the residence cooked together, ate meals together, shared in household activities, and attended social and religious functions together. *Id.* at 908. The home was "'not a transient establishment but rather the residents usually remain[ed] for substantial periods of time and move[d] only for health reasons or personal preference.'" *Id.* at 909. Despite the fact that the residents paid the homeowner $200 per month for room and board, our Supreme Court determined that the residents were living as a single housekeeping unit, and the homeowner's use was permitted as a "single-family dwelling" under the local zoning ordinance. *Id.*

In *Albert v. Zoning Hearing Board of North Abington Township*, 854 A.2d 401 (Pa. 2004), our Supreme Court considered whether a "halfway house for recovering alcoholics and drug-addicts . . . qualified as a 'single-family detached dwelling' under the local zoning ordinance." *Id.* at 402. Under that local zoning ordinance, a "'single-family dwelling'" was defined as "'a detached building, designated for or occupied exclusively by **one family** and containing not more than one dwelling unit.'" *Id.* at 404 (emphasis added). The local zoning ordinance did not define "family." *Id.* In interpreting the meaning of the word "family," our Supreme Court, citing *Appeal of Miller*, determined that "'**single housekeeping unit' must be considered the plain and ordinary meaning of 'family' in the zoning context.**" *Id.* at 405-06, 407 n.5 (emphasis added). Our Supreme Court

10

further noted that "[w]hile this Court has never before explicitly stated that transiency is incompatible with the notion of a single-family household, it is undeniable that **inherent in the concept of 'family' and, in turn, in the concept of a 'single-family dwelling,' is a certain expectation of relative stability and permanence in the composition of the familial unit.**" *Id.* at 409 (emphasis added). Because the halfway house's residents' average stay was only two to six months, our Supreme Court determined that the halfway house's use was purely transient and it did not qualify as a single-family dwelling. *Id.* at 410.

In *Slice of Life*, our Supreme Court was evaluating whether a local zoning ordinance permitted property owners to use their property as a short-term rental unit when it was located in a single-family residential zoning district. The local zoning ordinance in *Slice of Life* defined a "family" as "'[o]ne or more persons occupying a dwelling unit, **related by blood, marriage, or adoption, living together as a single housekeeping unit** and using cooking facilities and certain rooms in common.'" *Slice of Life*, 207 A.3d at 898 (emphasis added). Our Supreme Court, relying on *Albert* and *Appeal of Miller,* noted that although "single housekeeping unit" is not defined in the zoning ordinance, it "is a term of art that is widely used in zoning ordinances," and "[t]his Court has adopted the common definition of 'single housekeeping unit,' used by courts throughout the country, as requiring the person or persons residing in the home to function as a family and to be 'sufficiently stable and permanent' and not 'purely transient.'" *Id.* at 899 (quoting *Albert*, 854 A.2d at 409-10; *Appeal of Miller*, 515 A.2d at 907-09). Our Supreme Court concluded that "**by defining 'family' by requiring 'a single housekeeping unit,' the [o]rdinance clearly and unambiguously excluded, in pertinent part, purely transient uses of property in [a single-family residential district].**" *Id.* (emphasis added).

11

Accordingly, the Court determined that the local zoning ordinance did not permit the property owner to use its property for short-term rentals. *Id.*

Hope House asserts that our Supreme Court has established that a "single housekeeping unit" cannot include purely transient uses. In *Appeal of Miller*, *Albert*, and *Slice of Life*, however, our Supreme Court was interpreting the phrase "single housekeeping unit" as part of the definition of a "family" for the purpose of determining if uses were permitted in single-family residential zoning districts. Here, we are interpreting the phrase "single housekeeping unit" in the definition of a "group residence" for the purpose of determining if Hope House's proposed use qualifies as a conditional use in a multi-family residential zoning district. For the reasons outlined below, the logic and reasoning used to interpret the meaning of "single housekeeping unit" in the definition of a "family" cannot be extended to interpret the meaning of "single housekeeping unit" in the Ordinance's definition of a "group residence."

First, a single-family residence and a group residence are very different. In *Albert*, our Supreme Court noted that "transiency is incompatible with the notion of a single-family household" and that "inherent in the concept of 'family' and, in turn, in the concept of a 'single-family dwelling,' is a certain expectation of relative stability and permanence in the composition of the familial unit." *Albert*, 854 A.2d at 409. Group residences, unlike single-family households, do not have an inherent expectation of stability. Group residences serve various functions, some of which provide short-term rehabilitative services, others of which house individuals on an extended basis. Although some residents may remain living in the same group home for extended periods of time, transiency is a fact of life in group residence settings.

12

Second, Borough did not intend to adopt the definition of "single housekeeping unit" that was developed by our Supreme Court in *Albert* and *Slice of Life*. Borough enacted the Ordinance in 1989 and last revised the sections at issue in this matter in 1993 (Section 601) and 1997 (Section 201 and Table 201). R.R. at 163a, 166a, 205a. Our Supreme Court issued its decision in *Albert* in 2004 and *Slice of Life* in 2019. Accordingly, Borough could not have intended, in 1989, 1993, and 1997, to adopt our Supreme Court's definition of "single housekeeping unit."

Third, the Ordinance's plain language indicates that "single housekeeping unit" was not intended to be synonymous with "family." The Ordinance's definition of "group residence" begins with the phrase "a dwelling facility operated . . . ." The Ordinance does not use the word "facility" in its definition of "family," and both the word "facility" and the context within which it appears implies that business will be conducted on the premises. In addition, the Ordinance's definition of "group residence," in limiting the number of persons that may reside at the residence to 15, adds "plus staff." The Ordinance does not use the word "staff" in its definition of "family," which shows that Borough intended for separate "staff" members to supervise group residences but not family residences.

Fourth, the Ordinance's definition of "group residence," by using the disjunctive "or," made "living together as a single family" and "living together . . . as a single housekeeping unit" two separate and distinct concepts. In interpreting the definition of "family," our Supreme Court determined that "[t]his Court has adopted the common definition of 'single housekeeping unit,' used by courts throughout the country, as requiring the person or persons residing in the home **to function as a family** and to be 'sufficiently stable and permanent' and not 'purely transient.'" *Slice of Life*, 207 A.3d at 899 (quoting *Albert*, 854 A.2d at 409-10;

13

*Appeal of Miller*, 515 A.2d at 907-09) (emphasis added). In *Albert*, Our Supreme Court noted that "'**single housekeeping unit' must be considered the plain and ordinary meaning of 'family' in the zoning context.**" *Albert*, 854 A.2d at 407 n.5 (emphasis added). If we interpret "single housekeeping unit" in the Ordinance's definition of "group residence" to be synonymous with "family," it would result in the Ordinance's definition of "group residence" stating that the residents of a group residence must be living together as a single family or as a family. This interpretation would not give any meaning to the phrase "single housekeeping unit," and would, therefore, provide an absurd result. *See* 1 Pa.C.S. § 1922 (rules of statutory construction require that we presume the legislative body did not intend a "result that is absurd, impossible of execution or unreasonable," and the legislative body "intends the entire statute to be effective and certain").[6]

For the reasons set forth above, we conclude that persons "living together . . . as a single housekeeping unit" under the Ordinance's definition of "group residence" can include transient persons. As a result, Hope House's argument that it cannot qualify as a group residence because its residents are transient fails. Since Hope House's residents will have common living and dining areas and will participate in similar programs and activities within the residence, Hope House's residents will be living together as a single housekeeping unit for purposes of qualifying as a "group residence." Thus, Hope House's proposed use qualifies as a group residence under Section 601 of the Ordinance, and the Ordinance "is not de jure exclusionary," because Table 201 of the Ordinance allows a group residence as a conditional use in R-3 districts. *See Kratzer*, 611 A.2d at 814.

---

[6] "Although the Statutory Construction Act . . . does not apply expressly to zoning and subdivision ordinances, the principles in the act are followed in construing a local ordinance." *Tobin v. Radnor Twp. Bd. of Comm'rs*, 597 A.2d 1258, 1264 (Pa. Cmwlth. 1991) (citations omitted).

14

Having concluded that the Ordinance does not exclude Hope House's proposed use, we briefly turn to whether Borough abused its discretion or committed an error of law in denying the Curative Amendment. Our Supreme Court aptly set forth the validity of single-family zoning as follows:

> To properly frame the matter before us, some background regarding the underlying law is useful. A property owner has a constitutionally protected right to the enjoyment of his or her property. Pa. Const. art. I, § 1 (providing for the "inherent" right of "acquiring, possessing and protecting property"); *Newtown Square E., L.P. v. Twp. of Newtown*, . . . 101 A.3d 37, 51 ([Pa.] 2014). That right is permissibly limited by a zoning ordinance that is substantially related to the protection of the public health, safety, morality and welfare – commonly known as a municipality's "police power." *In re Realen Valley Forge Greenes Assoc.*, . . . 838 A.2d 718, 728 ([Pa.] 2003) (*quoting C & M Developers, Inc. v. Bedminster Twp. Zoning Hearing Bd.*, . . . 820 A.2d 143, 150 ([Pa.] 2002)).
>
> The establishment of residential zoning districts has long been recognized as a valid exercise of a municipality's police power. They serve to insulate areas intended for residential living from increased noise and traffic, protect children living there and their ability to utilize quiet, open spaces for play, and to maintain "the residential character of the neighborhood." *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 . . . (1926). Non-family uses, including fraternity houses and boarding houses, have been found to be antithetical to the "residential character," as "[m]ore people occupy a given space; more cars . . . continuously pass by; more cars are parked; [and] noise travels with crowds." *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9 . . . (1974). As the high Court explained,
>
>> A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within *Berman v. Parker*, [348 U.S. 26, (1954) (discussing the broad concept of public welfare)]. The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of

15

> quiet seclusion and clean air make the area a sanctuary for people.
>
> *Id.*

*Slice of Life*, 207 A.3d at 888-89. The court continued: "[t]he permanence and stability of people living in single-family residential zoning districts creates a sense of community, cultivates and fosters relationships, and provides an overall quality of a place where people are invested and engaged in their neighborhood and care about each other." *Id.* at 900.

In Borough's single-family residential zoning districts (R-1), the Ordinance only allows accessory uses, single-family dwellings, and parks and recreation as permitted uses. The Ordinance does not allow a group residence, even as a conditional use, in R-1 districts. In fact, the Ordinance does not allow a group residence as a permitted use in any of its residential zoning districts, and the Ordinance only allows a group residence as a conditional use in its least restrictive residential zoning districts (R-3). By only providing for a group residence as a conditional use, the Ordinance permits Borough to regulate group residences and ensure that they comply with health and safety requirements before approval. The Curative Amendment not only proposed that community living arrangements (which are essentially group residences) be allowed in R-1 districts, but that they be permitted uses in R-1 districts. Thus, if Borough adopted the Curative Amendment, community living arrangements could be placed in Borough's R-1 districts, Borough's most restrictive zoning districts, and Borough would not be able to regulate them or ensure that they comply with health and safety requirements before approval. Borough's Planning Commission pointed out this distinction and opined that the Curative Amendment was too broad. Under the circumstances, Borough did

16

not abuse its discretion or commit an error of law in agreeing with its Planning Commission and denying the Curative Amendment.

We need not further evaluate Hope House's arguments that Borough improperly denied the Curative Amendment, because those arguments all rely upon the false presumption that the Ordinance totally excluded Hope House's proposed use.

### III. Conclusion

Like Common Pleas, we agree that Hope House's purpose is admirable. It also does not escape this Court that local government officials may have steered Hope House in the wrong direction. Nevertheless, the Ordinance does not totally exclude Hope House's proposed use because it qualifies as a "group residence," which is a conditional use in Borough's multi-family residential zoning districts (R-3). As a result, we must affirm Common Pleas' order denying Hope House's appeal of Borough's denial of Hope House's proposed curative amendment.

_____
STACY WALLACE, Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Hope House in Midland PA, | : | |
| A Non-Profit Corporation, | : | |
| Appellant | : | |
| | : | No.  145 C.D. 2022 |
| v. | : | |
| | : | |
| Borough of Midland, PA, | : | |
| A Municipal Corporation | : | |

# **O R D E R**

**AND NOW**, this 7th day of November, 2022, the January 25, 2022 order of the Court of Common Pleas of Beaver County is **AFFIRMED**.

_____
STACY WALLACE, Judge