[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14761

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 8, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-01696-CV-T-30-MSS

MATTHEW SCHWARZ,
GULF COAST RECOVERY, INC., a Florida corporation,

Plaintiffs-
Defendants-Cross-
Claimants-Appellants,

JOHN DOE I,
JANE DOE V,
anonymous individuals,

Plaintiffs-Appellants,

versus

CITY OF TREASURE ISLAND,

Defendant-
Plaintiff-Cross-
Defendant-Appellee,

CITY OF TREASURE ISLAND CODE ENFORCEMENT BOARD,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(October 8, 2008)**

Before CARNES and MARCUS, Circuit Judges, and DUBOSE,[*] District Judge

MARCUS, Circuit Judge:

Gulf Coast Recovery, Inc. and its principal, Matthew Schwarz, operate six halfway houses for recovering substance abusers in the City of Treasure Island, Florida. Following complaints from neighbors about excessive noise, constant turnover, and the use of the properties for recovering addicts, the City investigated one of the houses and cited Schwarz for violating a City zoning ordinance that limited occupancy turnover. The City's Code Enforcement Board upheld the citation after a public hearing. The Board then socked Schwarz with a $250 per day fine for that house. Thereafter, the City cited two more houses for violating the same ordinance.

Rather than appeal the Board's decisions in state court, Schwarz, Gulf Coast Recovery, Inc., and several John and Jane Does residing in the houses (collectively "Gulf Coast") sued Treasure Island and the Board (collectively "the City") in

_____

[*] Honorable Kristi DuBose, United States District Judge for the Southern District of Alabama, sitting by designation.

2

federal court. They alleged that enforcement of the occupancy-turnover rule against the halfway houses amounted to disparate treatment, disparate impact, and a failure to reasonably accommodate the disabled under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Rehabilitation Act ("RA"), 29 U.S.C. § 701 et seq., and violated the equal protection clauses of the Federal and Florida Constitutions. For good measure, Gulf Coast also claimed that the hearings conducted before the Board violated Schwarz's right to due process under the Federal and Florida Constitutions. After denying Gulf Coast's request to supplement its amended complaint to add an unrelated claim, the district court granted final summary judgment to the City. See Schwarz v. City of Treasure Island, 521 F. Supp. 2d 1307 (M.D. Fla. 2007). Gulf Coast appeals from the denial of leave to supplement and the entry of final summary judgment.

Although we agree with nearly all of the district court's conclusions, we differ in one important respect: on this record, we cannot determine whether Treasure Island must accommodate four of the six halfway houses because a genuine issue of material fact may exist about whether living in the halfway houses is "necessary" to afford recovering substance abusers an "equal opportunity to use and enjoy" the halfway houses. 42 U.S.C. § 3604(f)(3)(B). Accordingly, we

3

affirm the district court's denial of leave to supplement and its order of summary judgment on all but the reasonable accommodation claim, which we remand for further proceedings consistent with this opinion.

I.

We begin with the essential undisputed facts and procedural history. The City of Treasure Island is a small coastal community on Florida's Gulf Coast. Treasure Island has only 7,500 permanent residents, but during tourist season the area's warm sun, soft sand, and gentle surf draw vacationers and snowbirds by the thousands, doubling the City's winter population. Although these visitors are surely a boon to Treasure Island's business community, housing them in the City's residential areas disrupts the sense of community and stability treasured by the City's permanent residents.

To deal with this difficult problem, Treasure Island's zoning scheme divides residences into residential dwellings and tourist dwellings, and forbids the latter in its lowest density zoning districts. Under the City's Code of Ordinances, a "[d]welling, residential" "means a single-family, two-family, or multiple-family dwelling which is not a tourist dwelling." Code of Ordinances of the City of Treasure Island, Florida § 68-2 (1997) (hereinafter "Code"). A "tourist dwelling," in turn, "means a single-family or two-family dwelling which is used . . . primarily

4

on a daily, weekly, monthly or seasonal basis . . . ." Id.[1] Tourist dwellings are

permitted uses in the three highest density districts -- RFM-30, RFH-50, and CG --

but forbidden in the RU-75 and RM-15 districts. By barring tourist dwellings in

the RU-75 and RM-15 districts, the City has created a limit on the number of times

a "single-family or two-family dwelling" can change occupancy during a twelve-

month period in those districts. For convenience, we refer to this limitation

embodied in the definition of "tourist dwelling" as the "occupancy-turnover rule."

The RU-75 and RM-15 districts are not identical. For our purposes, the

main difference between them is that only single-family residential dwellings are

---

[1] In pertinent part, the Code explains when a dwelling qualifies as a "tourist dwelling" this way:

> If the single-family or two-family dwelling operates under or is subject to an arrangement plan or design whereby sleeping accommodations and sanitary facilities in the dwelling or in a unit in the dwelling are offered to the public or reserved to private parties and the use thereof by members of the public is primarily on a daily, weekly, monthly or seasonal basis, it shall be considered a tourist dwelling. Provided that when the dwelling or unit in the dwelling is the sole residence of the guest, a rebuttable presumption arises that the dwelling or unit is not being used as a tourist home. Provided further that if the occupancy of such dwelling or unit does not change more frequently than six times or more in any continuous 12-month period, then a rebuttable presumption shall arise that the dwelling or unit is not being used as a tourist dwelling.

> In addition to the above, if a single-family dwelling located in the RU-75 land use district is operated or used in such a way that it has a turnover in occupancy of more than two times in any one year, it shall create a rebuttable presumption that such single-family dwelling is a tourist dwelling.

Code § 68-2.

permitted in RU-75 districts, while RM-15 districts allow any type of residential

dwelling, including multi-family dwellings, such as apartment buildings and

condominium complexes.

The application of this zoning scheme, and in particular the application of

the occupancy-turnover rule, to Schwarz and his company, Gulf Coast Recovery, is

at the heart of this lawsuit. Gulf Coast Recovery is licensed by the Florida

Department of Children and Families to provide outpatient rehabilitation services

to recovering drug and alcohol abusers at its treatment facility in Treasure Island.

Notably, the company's license does not allow it to provide in-patient or residential

treatment. As a result, clients must find other accommodations while receiving

treatment.

To meet their clients' housing needs, Schwarz and Gulf Coast Recovery own

or lease six single- or multi-family properties in Treasure Island. Four of the

properties are zoned RM-15, and two are zoned RU-75. Descriptions of the

properties and their immediate surroundings are set out in the margin.[2]

---

[2] The four RM-15 properties are:

- A single-family dwelling at 250 115th Avenue. The property "is surrounded by a four-unit apartment complex on one side and a single family structure on the other. It front [sic] a canal, and a large apartment structure is located across from the residence . . . ." Schwarz Aff. (Doc. 27) ¶ 6 n.1.

- A single-family dwelling at 10399 Paradise Boulevard. "It is surrounded by an apartment structure and single-family residences." Id. ¶ 6 n.3.

Although Gulf Coast cannot provide any formal rehabilitation treatment at these properties because it does not have an in-patient license, only clients enrolled in Gulf Coast's treatment programs may move in to them. But residents may stay as long as they wish after completing their outpatient treatment. Clients opting to live in these halfway houses sign short-term leases with Schwarz or Gulf Coast, and generally pay between $1,000 and $2,000 per month to lease a single bedroom. Tenants are required to remain sober and drug-free and to refrain from various other activities while living in the properties. Incorporated into the leases as "Property Rules," these restrictions include: (1) not consuming drugs or alcohol; (2) not viewing pornography; (3) not possessing weapons; (4) agreeing to maintain the property; and (5) not having overnight guests without the permission of Gulf Coast Recovery.

---

- An "eight unit apartment structure" at 12275 3rd Street East. Id. ¶ 6 n.4. "It surrounded [sic] by a single-family residential structure and an apartment structure. Across the street . . . is a large, town home project." Id.

- A single-family dwelling at 12305 3rd Street East. "It surrounded [sic] by an eight-unit apartment structure and a five-unit apartment structure." Id. ¶ 6 n.6.

  The two RU-75 properties are:

- A single-family dwelling located at 10214 Tarpon Drive. Unsurprisingly, given that the RU-75 district permits only single-family dwellings, this property "is surrounded by single-family structures." Id. ¶ 6 n.2.

- A single-family dwelling located at 10101 Tarpon Drive. Similarly, this property "is surrounded by single-family structures." Id. ¶ 6 n.5.

7

Because neither Schwarz nor any Gulf Coast counselor lives at any of the properties, primary responsibility for enforcing the rules falls on the tenants, who have a powerful interest in not being exposed to drugs or alcohol during their rehabilitation. Schwarz furnishes each property and provides food, but the residents prepare their own meals, clean up after themselves, do their own laundry, and socialize together in their free time. Although some residents have stayed as long as five months, most residents leave after completing their outpatient treatment, and the average stay is six to ten weeks.

Schwarz and the City of Treasure Island first began to butt heads in late 2004 after neighbors of two of the properties -- 12305 3rd Street East and 10214 Tarpon Drive -- complained about excessive noise and constant turnover, and told the City that the properties were being used as rehabilitation facilities for recovering substance abusers. On December 13, 2004, Treasure Island sent Schwarz a document entitled "Code Enforcement Detail" observing that he had "opened up 2 rehab. houses on the island." Doc. 27, Ex. D. A handwritten note on the bottom of the document reads: "Please come in A.S.A.P. (5 day) to apply for a license for both your homes. See Peggy." Id. After speaking with his attorney, Schwarz went to City Hall to apply for a rental license. Schwarz met with Peggy Proper, a City employee, who asked him to provide specific information about the

8

properties, including the number of tenants, the amount of turnover, and the length of the leases. After Schwarz refused to provide any of this information, Ms. Proper denied his verbal request for a rental license.

Soon thereafter, City Code Enforcement Officer Carol Kitts sent Schwarz the following letter:

> It has come to our attention that you have two rentals in this city being used as boarding, halfway, or other type of group home where there are more than three unrelated persons living together. The City of Treasure Island requires that a license be obtained for any type of rental use as mentioned above. Please submit a detailed letter explaining the type of rentals you have, the number of leases in each home, what the lease includes, Re: utilities, food[,] furnishings, rules, and activities which take place there. Please attach a copy of leases for each home.

Doc. 178, Ex. G. Again, rather than providing the information, Schwarz's lawyer wrote the City two days later asking the legal basis for the City's request, including citations to the relevant statute, ordinance, or rule. Doc. 178, Ex. H. "If no response is received within fifteen days," the lawyer concluded, "it will be presumed that the matter is closed." Id.

After receiving still further complaints, this time about a third piece of property -- 250 115th Avenue -- Officer Kitts, writing on behalf of the City, sent Schwarz a second letter, dated February 1, 2005, asking for essentially the same information requested in her first letter. Still again, Schwarz provided no

9

substantive response. Instead, by letter dated February 3, 2005, the lawyer informed Officer Kitts that, because she had not provided the legal basis for the request, Schwarz considered the matter closed and would not respond further. Doc. 178, Ex. J.

Having twice tried and failed to obtain basic information about the properties from Schwarz, Officer Kitts wrote Schwarz a third time on February 14, 2005. Again, Kitts began the letter by reminding Schwarz that the City had received complaints about zoning violations at his properties, and she specifically asked him to

> submit a letter detailing the character of use for each of the . . .
> addresses including:
>
> 1. Property owner
> 2. Frequency of tenant turnover
> 3. Any on site counseling
> 4. Any on site congregate dining
> 5. The number of unrelated families/persons in each unit
> 6. Are rental leases required for each unrelated family?

Doc. 178, Ex. K. Kitts also explained that the City needed this information to "determine if zoning violations exist." Id. Indeed, she warned Schwarz that if he did not cooperate, the City would "proceed with a violation process based on the information to date." Id.

On February 21, 2005, Schwarz's lawyer responded with a threatening letter

that provided the City with <u>no</u> information.  Specifically, Schwarz's attorney

wrote:

> Again, you have failed to provide a specific legal basis for your requests other than the coy statement "the basis is violation of the City of Treasure Island zoning regulations."  Furthermore, each and every fact that you have predicated this statement on is completely false and unsupported by any evidence.
>
> Based on your statements, I can only conclude that you and the City of Treasure Island intend to harass my client and refuse to provide a specific citation to the City of Treasure Island zoning regulations in which it is in violation.  Please note that I will be taking appropriate measures if you contact my client again with false accusations and no supportable legal position.   GOVERN YOURSELF ACCORDINGLY.

Doc. 178, Ex. L.

Thrice rebuffed in its attempts to investigate the neighbors' complaints and

settle the matter amicably, Treasure Island decided to cite Schwarz for two

violations.  By formal Notice of Violation dated April 25, 2005, the City cited

Schwarz (1) for using the 12305 property as a community residential home without

a state license, and (2) for operating more than one business -- a satellite treatment

office and a commercial rental -- at the 12305 property without obtaining separate

licenses from the City.[3]   At a Code Enforcement Board hearing on June 23, 2005,

---

[3] After Schwarz received the notice, but prior to any hearing, his attorney attempted to schedule a meeting with Treasure Island's code enforcement staff.  The parties scheduled a meeting for June 30, 2005, but Schwarz's attorney cancelled the meeting apparently due to a scheduling conflict, and it was never rescheduled.

Schwarz testified that he provided no treatment at the 12305 property, that the property was his residence, and that the other people living there were his roommates. Based on Schwarz's testimony, the Board dismissed the April 25, 2005 Notice of Violation.

On July 8, 2005, Treasure Island again cited Schwarz for his operation of the 12305 property, this time for a violation of section 68-221 of the City's Code of Ordinances, which forbids all uses that are not "specifically delineated as a permitted use, special exception use or accessory use in the district regulations for such district." The 12305 property is zoned RM-15, again, a classification that allows single-, two-, and multi-family homes, but not tourist dwellings. At a Code Enforcement Board hearing conducted on August 10, 2005, Schwarz produced, pursuant to subpoena, sixty-eight leases for the 12305 property covering a thirteen-month period. Apparently fearing the implications of having so many leases on one property, Schwarz's attorney argued that the 12305 property was not a tourist dwelling because it was the occupants' sole residence during their time in Treasure Island. See Code § 68-2 ("[W]hen the dwelling or unit in the dwelling is the sole residence of the guest, a rebuttable presumption arises that the dwelling or unit is not being used as a tourist home.").

The Board rejected this argument, concluding that the number of leases

12

alone demonstrated that Schwarz violated section 68-221 by operating a tourist dwelling in an RM-15 district. After Schwarz refused to make any changes to his operation of the property, the Code Enforcement Board held another hearing on August 25, 2005 and fined Schwarz $250 per day until he agreed to limit occupancy turnover at the property so that it would no longer fall within the definition of "tourist dwelling." The City then cited two more of Schwarz's properties -- 250 115th Avenue and 10214 Tarpon Drive -- on the same tourist-dwelling theory.

Instead of appealing the Board's interpretation of the zoning ordinance to the state circuit court, see Fla. Stat. § 162.11; Code § 2-169, on September 9, 2005, Schwarz, along with Gulf Coast Recovery and several Jane and John Does, sued Treasure Island and the Code Enforcement Board in the United States District Court for the Middle District of Florida. Their amended complaint alleged that the City's enforcement actions unlawfully discriminated against the residents of the halfway houses and, by extension, Schwarz and Gulf Coast Recovery. Specifically, Gulf Coast claimed that, as recovering substance abusers, the residents of the halfway houses were disabled under federal law, and, therefore, that the City's conduct in investigating, prosecuting, and fining Schwarz violated the Fair Housing Act, 42 U.S.C. § 3601, et seq., the Americans with Disabilities

13

Act, 42 U.S.C. § 12101, et seq., and the Rehabilitation Act, 29 U.S.C. § 701, et seq., under three distinct theories: disparate treatment of the handicapped; disparate impact upon the handicapped; and failure to reasonably accommodate the residents' addiction. In addition, the complaint alleged that the City's actions violated the equal protection clauses of the Federal and Florida Constitutions and that the Code Enforcement Board's attorney violated Schwarz's due process rights under the Federal and Florida Constitutions by questioning witnesses and commenting on evidentiary matters during the hearings on August 10 and August 25, 2005.[4]

Ten days later, Gulf Coast moved the district court for a preliminary injunction barring any further fines or hearings and preventing the City from contacting Gulf Coast's clients or the owners of the halfway houses that Schwarz and Gulf Coast had leased. Prior to the preliminary injunction hearing, the City submitted affidavits from Lynn Rosetti, Treasure Island's City Planner, and Officer Kitts. Both averred that, before filing his federal lawsuit, neither Schwarz nor his attorney had ever requested a reasonable accommodation from the City or even explained to them how he was using the properties. Similarly, at the preliminary injunction hearing itself, Ralph Stone, the City Manager, testified that Schwarz

---

[4] The complaint also alleged a violation of Florida administrative law, but Gulf Coast has abandoned this claim, so we have no occasion to address it.

14

never sought an accommodation, and that, if he had, Treasure Island would have worked with him to reach a compromise.

Sensing (or perhaps hoping) that the dispute could be resolved if the parties actually talked to each other, the magistrate judge overseeing the preliminary injunction hearing agreed to hold the motion in abeyance so that Schwarz could file a formal reasonable accommodation request and the parties could negotiate. By letter dated December 7, 2005, Schwarz requested "that the City allow [Gulf Coast] clients to continue residing within the residences without any further administrative requests or approvals." Doc. 60, Ex. A at 3. The letter explained the basis for the request this way:

> This request relates to the existing residences described in the Amended Complaint. Under this accommodation request, Gulf Coast would require its client to sign an affidavit at the beginning of his or her occupancy, certify that the residence serves as his or her sole place of abode, and conclusively attest that the residence is not being used as a timeshare or vacation home. If so sworn, the use of the residence would presumptively not constitute a tourist residential dwelling. I believe that such an affidavit would address the City's stated concerns about transient uses.

Id.

At a meeting on December 15, 2005, Schwarz provided the City with more information about the houses, and the parties discussed whether an accommodation was required. Based on the information it had, the City concluded that no

15

accommodation was necessary. The City explained its position to the court this way:

> Based upon the evidence presented by Plaintiffs at the hearing regarding the average length of time that Mr. Schwarz's tenants remain at his houses and upon the leases which Plaintiffs produced at the December 15, 2005 meeting, the City believes that its current zoning regulations sufficiently "accommodate" Plaintiffs and that any lessening of the restrictions on tenant turnover would fundamentally alter the City's zoning scheme and afford Plaintiffs rights not enjoyed by persons residing in the City's RU-75 and RM-15 residential zoning districts.

Doc. 64 at 1-2.

With the chances of a negotiated settlement now effectively zero, on July 17, 2006, the magistrate judge ruled on Gulf Coast's preliminary injunction motion. She concluded that Schwarz's properties were not "dwellings" under the FHA, and that, even if they were, the zoning regulations already reasonably accommodated Gulf Coast. Accordingly, she recommended that no preliminary relief be granted, a conclusion the district court adopted.[5]

On November 30, 2006, Gulf Coast sought leave from the district court to

---

[5] After the district court adopted the Magistrate's Report and Recommendation, Gulf Coast filed an interlocutory appeal. A panel of this Court affirmed the district court's decision because "the question of whether 12305 3rd Street is a 'dwelling' within the meaning of the Fair Housing Act is sufficiently close and complex to warrant affirming the district court's denial of a preliminary injunction." Schwarz v. City of Treasure Island, 243 Fed. Appx. 587, 588 (11th Cir. 2007) (unpublished decision). We noted, however, that our decision on the preliminary injunction question "d[id] not decide the ultimate issue of whether [Gulf Coast] will prevail." Id. Rather, "[w]e decide[d] only that the district court did not abuse its discretion in denying the request for a preliminary injunction." Id.

16

supplement its amended complaint with new allegations that Treasure Island discriminated against recovering substance abusers by refusing to allow residential treatment facilities in RM-15 and RU-75 zoning districts. The City opposed the motion, arguing that Gulf Coast had known about these facts for at least eleven months, and, therefore, the tardy supplementation was intended to delay trial. In a brief order, the district court denied Gulf Coast's motion for leave to supplement.

The parties then cross-moved for summary judgment, and, on October 3, 2007, the district court granted final summary judgment to the City on all of the claims. First, the district court accepted the magistrate's conclusion that the halfway houses were not "dwellings" under the FHA because residents' stays were relatively brief and they intended to return to their permanent abodes after completing treatment. Second, even assuming the properties were covered dwellings, the court concluded that Gulf Coast had failed to establish intentional discrimination, disparate impact, or a failure to reasonably accommodate. Finally, Gulf Coast's procedural due process claim concerning the August 10 and August 25, 2005 Code Enforcement Board hearings failed because Schwarz's counsel "was provided sufficient opportunity to cross-examine witnesses and enter evidence." Schwarz, 521 F. Supp. 2d at 1324.

Gulf Coast timely appealed, arguing that the district court had erred in

17

awarding summary judgment to the City and in denying leave to supplement the complaint.

II.

We review a grant of summary judgment de novo, examining the evidence in the light most favorable to the non-moving party and affirming if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  And we review the denial of leave to supplement a complaint under Fed. R. Civ. P. 15(d) for abuse of discretion. See Garfield v. NDC Health Corp., 466 F.3d 1255, 1270 (11th Cir. 2007) (denials of leave to amend pleadings under Fed R. Civ. P. 15(b) are reviewed for abuse of discretion); Franks v. Ross, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (explaining that the same standard of review applies to denials under Rules 15(b) and 15(d)).

At the outset, we observe that Gulf Coast on appeal has argued its discrimination claims only under the Fair Housing Act.  It has offered no distinct arguments based on the Americans with Disabilities Act, the Rehabilitation Act, or the equal protection clauses of the Federal and Florida Constitutions (even though it traveled under those provisions as well in the amended complaint).  The City likewise has focused only on the application of the FHA.  Accordingly, like the

18

parties, we confine our analysis to the Fair Housing Act.[6]

We turn, then, to the central issue raised in this appeal: whether the City of Treasure Island violated the Fair Housing Act by enforcing its occupancy-turnover rule against the halfway houses. Enacted as Title VIII of the Civil Rights Act of 1968, the Fair Housing Act originally barred discrimination in housing on the basis of race, color, religion, or national origin, and Congress added gender as a protected class in 1974. In 1988, Congress amended the FHA to prohibit discrimination based on handicap and familial status. See Fair Housing Amendments Act of 1988 ("FHAA"), Pub. L. No. 100-430, 102 Stat. 1619 (1988). The FHAA amended 42 U.S.C. § 3604, the primary substantive provision of the FHA, by adding a new subsection (f) that applies only to discrimination against the handicapped. Subsection (f) makes it unlawful:

> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a

---

[6] We note in passing, however, that there are important differences among these statutes and constitutional provisions. Thus, for example, plaintiffs claiming intentional discrimination under the RA must show that they were discriminated against "solely by reason of [their] disability," 29 U.S.C. § 794(a) (emphasis added), but the ADA requires only the lesser "but for" standard of causation, see McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1073-74 (11th Cir. 1996). Moreover, the ADA and the RA may be broader than the FHA because, as we shall see shortly, coverage under the FHA is limited to statutorily defined "dwellings," but that term appears nowhere in the relevant provisions of the ADA and the RA. See 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Finally, the equal protection clause prohibits only intentional discrimination, see Washington v. Davis, 426 U.S. 229, 248 (1976), but at least the ADA and the RA recognize disparate treatment and reasonable accommodation theories as well. Undoubtedly there are other differences, but we leave them for another day.

19

handicap of--

> (A) that buyer or renter,
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> (C) any person associated with that buyer or renter.

> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--

> (A) that person; or
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> (C) any person associated with that person.

42 U.S.C. § 3604(f)(1)-(2). For purposes of subsection (f) only, the revised Act provides that "discrimination includes," among other things:

> a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]

Id. § 3604(f)(3)(B).

The parties agree that § 3604(f) applies to zoning and that the residents of the halfway houses are "handicapped" within the meaning of the statute. They part ways after that. Gulf Coast says that the halfway houses qualify as "dwellings" under the Fair Housing Act, and that the City violated the Act by (1) enforcing the occupancy-turnover rule against the handicapped but not others; (2) enforcing the occupancy-turnover rule in a way that creates a disparate impact on the

20

handicapped; and (3) refusing to reasonably accommodate tenants' disabilities by not waiving the occupancy-turnover rule. The City, on the other hand, argues that the halfway houses are not "dwellings" and that, even if they were, Gulf Coast's three theories of liability fail as a matter of law.[7]

On this record, we are constrained to conclude that all six of the halfway houses qualify as "dwellings," and, thus, that the Fair Housing Act applies to them. But because Gulf Coast has presented no evidence of differential treatment of the handicapped or of disparate impact on the handicapped, we affirm the district court's grant of summary judgment to the City on those claims. Moreover, we conclude that requiring the City to allow high turnover at the properties located within the RU-75 zones would not be a "reasonable" accommodation, and,

_____

[7] The City also claims that this appeal concerns only the 12305 property and not the other five halfway houses. This argument is without merit. The relief Gulf Coast requested in its amended complaint plainly encompasses all six halfway houses. See, e.g., Am. Compl. ¶ 207(g) (requesting that the district court "[d]eclare that the Board cannot take any further action against Plaintiffs for operating or residing in the residences described herein"). And when Schwarz formally requested a reasonable accommodation in December 2005, he made clear that his request "relate[d] to the existing residences described in the Amended Complaint," Doc. 60, Ex. A at 3 (emphasis added), so there can be no doubt that Schwarz thought this lawsuit covered all six halfway houses. Moreover, when the City informed the magistrate judge that, in its view, no accommodations were required, it relied on the length of stay at Schwarz's "houses" and argued that granting an accommodation would "afford Plaintiffs rights not enjoyed by persons residing in the City's RU-75 and RM-15 residential zoning districts." Doc. 64 at 2-3 (emphasis added). The 12305 property is one house in an RM-15 district. If the City really believed that this case involved only the 12305 property, it would not have referred to the turnover rate at Schwarz's "houses" nor would the rights of residents in RU-75 zones be relevant. Because the amended complaint plainly seeks relief as to all six houses and the parties litigated the case that way, we have no basis for narrowing the case now. Therefore, the question before us is whether the occupancy-turnover rule may be applied lawfully to any of the six halfway houses.

21

therefore, that Gulf Coast's reasonable accommodation claim concerning those halfway houses fails as well.

We conclude, however, that it would be a reasonable accommodation to allow Gulf Coast to operate the four remaining halfway houses located within the RM-15 zones because those zones already permit unlimited turnover in the multi-family dwellings that surround these four properties. But the City only would be obliged to make this accommodation if it were "necessary to afford [recovering substance abusers] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The district court never addressed whether there was a genuine issue of material fact about this essential element of a reasonable accommodation claim. Therefore, we remand to the district court only the issue of "necessity" as to the four halfway houses zoned RM-15 (250 115th Avenue, 10399 Paradise Boulevard, 12275 3rd Street East, and 12305 3rd Street East) so that it may determine whether there is a genuine issue of material fact.

A.

We begin with whether the halfway houses are "dwellings" under the Fair Housing Act. Like the pre-1988 provisions of the FHA, § 3604(f) applies only to "dwellings," which the statute defines as

> any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more

22

families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

42 U.S.C. § 3602(b).  The district court concluded that the halfway houses did not meet this definition because the residents' stays were too short and most of them intended to return to some other home upon completing their treatment at Gulf Coast Recovery.  We disagree and conclude that, on the undisputed facts, the halfway houses are "dwellings" under the FHA.

We start, as always, with the language of the statute.  The statutory definition of "dwelling" turns on the meaning of the word "residence," see United States v. Columbus Country Club, 915 F.2d 877, 881 (3d Cir. 1990), but neither the statute nor the regulations define the word.  A regulation promulgated by the Department of Housing and Urban Development ("HUD"), however, defines the term "dwelling unit" this way:

> Dwelling unit means a single unit of residence for a family or one or more persons. Examples of dwelling units include: a single family home; an apartment unit within an apartment building; and in other types of dwellings in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep. Examples of the latter include dormitory rooms and sleeping accommodations in shelters intended for occupancy as a residence for homeless persons.

24 C.F.R. § 100.201 (emphases added).  Although this definition provides some

23

examples of dwellings covered by the FHA, it too relies on the undefined word "residence." Because there is no statutory or administrative definition of "residence," we look to its ordinary, everyday meaning. See, e.g., Nat'l Coal Ass'n v. Chater, 81 F.3d 1077, 1081 (11th Cir. 1996) ("Terms that are not defined in the statute . . . are given their ordinary or natural meaning."); see also Columbus Country Club, 915 F.2d at 881 (looking to the ordinary meaning of "residence").

Webster's Third New International Dictionary (2002) defines "residence" as, among other things, "a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit[.]" In other words, as the administrative definition of "dwelling unit" suggests, the house, apartment, condominium, or co-op that you live in is a "residence," but the hotel you stay in while vacationing at Disney World is not. Compare Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1036 (2d Cir. 1979) (noting that "dwelling" "clearly" includes "cooperative apartment buildings"), with Schneider v. County of Will, 190 F. Supp. 2d 1082, 1087 (N.D. Ill. 2002) (holding that a bed-and-breakfast is not a "dwelling"); Patel v. Holly House Motels, 483 F. Supp. 374, 381 (S.D. Ala. 1979) (holding that a motel is not a "dwelling").

Although the scope of the term "residence" may be clear at the ends of the

24

spectrum, many buildings fall somewhere in between.[8]  Nevertheless, we think the

differences between a home and a hotel suggest at least two relevant principles: (1)

the more occupants treat a building like their home -- e.g., cook their own meals,

clean their own rooms and maintain the premises, do their own laundry, and spend

free time together in common areas -- the more likely it is a "dwelling"; and (2) the

longer the typical occupant lives in a building, the more likely it is that the building

is a "dwelling."

In Lakeside Resort Enterprises, L.P. v. Board of Supervisors of Palmyra

Township, 455 F.3d 154 (3d Cir. 2006), a panel of the Third Circuit relied on these

principles to conclude that a drug- and alcohol-treatment center met the definition

of "dwelling."  In that case, coverage caps imposed by patients' health insurers

limited their average stay to 14.8 days, but residents "not limited by funding"

stayed longer, and the facility was "intended to accommodate 30-day stays as a

matter of course and even longer stays on occasion."  Id. at 159.  Citing a study by

the American Hotel and Lodging Association, the court noted that, in 2004, 63% of

business travelers and 73% of leisure travelers spent only one or two nights per

---

[8] Thus, for example, courts have considered properties as diverse as cabins occupied by
migrant farm workers (found to be  dwellings in Villegas v. Sandy Farms, Inc., 929 F. Supp.
1324, 1328 (D. Or. 1996)), a city jail (found not to be a dwelling in Garcia v. Condarco, 114 F.
Supp. 2d 1158, 1163 (D.N.M. 2000)), and a children's group home where the average stay was
nine or ten months (found to be a dwelling in Cohen v. Twp. of Cheltenham, 174 F. Supp. 2d
307, 323 (E.D. Pa. 2001)).

25

hotel stay. Id. at 159 n.9. Thus, the court concluded that the 14.8 day average stay at the treatment center was "certainly longer than the typical stay in a motel," and qualified that facility under the first principle. Id. at 159.

Likewise, the patients' lifestyles while living at the treatment center satisfied the second principle -- treating the building like a home. The patients ate meals together, returned to their rooms in the evening, received mail at the facility, hung pictures on their walls, and had visitors in their rooms. In short, "they treated it like a home for the duration of their stays." Id. at 160.

The United States District Court for the District of Connecticut reached the same result in Connecticut Hospital v. City of New London, 129 F. Supp. 2d 123 (D. Conn. 2001). Much like in this case, the three group homes at issue in Connecticut Hospital housed recovering substance abusers while they attended an outpatient recovery program. Notably, however, they had to leave after finishing their treatment. See id. at 126. Patients lived in the houses for one to three months, and the average stay was six weeks. See id. at 132. The homes were "generally self-governing, with house members setting their own rules and working out most problems." Id. at 125. Moreover, "[h]ouse members often [ate] dinner together and attend[ed] a nightly Alcoholics Anonymous or Narcotics Anonymous meeting . . . as a group." Id. at 126. On these facts, the district court

26

concluded that the group homes were "dwellings" under the Fair Housing Act because "plaintiffs' occupancy resembles that of a resident far more than that of a hotel guest." Id. at 135 (quotation marks omitted).

The six halfway houses in this case are even more like homes than the facilities examined in Lakeside Resort and Connecticut Hospital. In the first place, residents stay on average six to ten weeks -- much longer than the one to two day stays of most hotel guests. Moreover, their stays far exceed the 14.8 day average stay of the residents in Lakeside Resort. And unlike the group homes in Connecticut Hospital, residents are not required to leave the halfway houses after completing their treatment with Gulf Coast. Indeed, they may remain indefinitely, and some residents have lived in them for as long as five months.

Second, the Gulf Coast halfway houses are far more like homes than hotels because they have common living areas, such as kitchens and living rooms, where residents can socialize like a family. In fact, five of the six halfway houses are single-family dwellings, rather than converted hotels where the only common areas may be the hallway and the parking lot. And the sixth is an eight-unit apartment structure. Moreover, the residents treat the halfway houses more like homes than hotels: they sign month-long leases for $1,000 to $2,000 per bedroom; they cook their own food; they eat together; they clean and maintain the premises; and they

27

spend their free time together. Again, these activities suggest that the halfway houses function more like residential homes than hotels. For these reasons, and because the Supreme Court has repeatedly instructed us to give the Fair Housing Act a "broad and inclusive" interpretation, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 731 (1995); Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972), we conclude that the halfway houses qualify as "dwellings" covered by the Act.

B.

Since the six halfway houses are "dwellings" and the Fair Housing Act applies to them, we turn to whether the City violated the Act, beginning with Gulf Coast's disparate treatment claim. As its name suggests, a disparate treatment claim requires a plaintiff to show that he has actually been treated differently than similarly situated non-handicapped people. See Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (per curiam) (rejecting handicapped persons' disparate treatment claim under the FHA because they "failed to introduce any evidence" that they had been treated differently than similarly situated non-handicapped people); United Farmworkers of Florida Hous. Project, Inc. v. City of Delray Beach, 493 F.2d 799, 808 (5th Cir. 1974) (noting that the plaintiff presented a prima facie case of racial discrimination because "minority citizens' requests [for

28

government services] were refused while white citizens' requests were granted").[9]

Gulf Coast, however, has utterly failed to establish that it was treated differently than anyone else. It cannot muster a single instance in which the City failed to enforce the occupancy-turnover rule against non-handicapped people, and at his deposition, Ralph Stone, the City Manager, testified that the City had enforced the occupancy-turnover rule against a non-handicapped person relatively recently. Because Gulf Coast was treated just like everyone else, it has no disparate treatment claim.

Nevertheless, like the Light Brigade, Gulf Coast charges on. In Gulf Coast's view, evidence of disparate treatment is unnecessary because a few neighbors and city commissioners allegedly said at public hearings that they did not want halfway houses for recovering substance abusers in their neighborhoods. These comments, Gulf Coast argues, are sufficient to create a genuine issue of material fact about the City's motives for fining Schwarz.

We are unpersuaded. Even assuming that Gulf Coast has accurately characterized the comments -- and the record is actually unclear on this point -- evidence that neighbors and city officials are biased against recovering substance

_____

[9] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (<u>en banc</u>), we adopted as binding precedent all decisions of the former Fifth Circuit that were rendered prior to October 1, 1981.

29

abusers is irrelevant absent some indication that the recoverers were treated differently than non-recoverers. See Oxford House-C v. City of St. Louis, 77 F.3d 249, 252 (8th Cir. 1996) ("Having concluded Oxford House did not show the City treated the Oxford Houses differently from any other group, we believe the City's enforcement actions were lawful regardless of whether some City officials harbor prejudice or unfounded fears about recovering addicts."). With selective-enforcement claims like this, evenhanded application of the law is the end of the matter. See United States v. Armstrong, 517 U.S. 456, 465 (1996) (explaining that a plaintiff bringing a selective-enforcement claim based on race "must show that similarly situated individuals of a different race were not prosecuted"); Ah Sin v. Wittman, 198 U.S. 500, 507-08 (1905) (rejecting a claim of selective enforcement based on Chinese nationality because the plaintiff failed to allege "that there were other offenders against the ordinance than the Chinese, as to whom it was not enforced"). The analysis might have been different if Gulf Coast claimed that the City enacted the occupancy-turnover rule in order to discriminate against people with disabilities. It does not and cannot make this claim, however, because the City enacted the rule in 1983, more than two decades before the events giving rise to this lawsuit, in an attempt, the legislative history suggests, to control time shares and similar kinds of transient residences for tourists. See Doc. 178, Ex. T.

C.

Appellants' <u>disparate impact</u> claim fares no better. Although neither this Court nor the Supreme Court has ever addressed whether the handicapped may pursue a disparate impact theory under § 3604(f), the City concedes that they can. For purposes of this discussion, therefore, we assume without deciding that Gulf Coast can bring a disparate impact claim. <u>See</u> <u>Town of Huntington v. Huntington Branch, N.A.A.C.P.</u>, 488 U.S. 15, 18 (1988) (per curiam) (assuming that the FHA allows a disparate impact claim in racial discrimination cases because appellants conceded the point). That assumption, however, does not help Gulf Coast much because it has not come close to making out a <u>prima facie</u> case of disparate impact.

In <u>Tsombanidis v. West Haven Fire Department</u>, 352 F.3d 565 (2d Cir. 2003), the plaintiff claimed that a local zoning rule violated the Fair Housing Act and the Americans with Disabilities Act because it had a disparate impact on group living arrangements for recovering substance abusers. The Second Circuit explained, correctly we think, that the relevant comparison for disparate impact purposes "is between (1) recovering alcoholics and recovering drug abusers ('recoverings') and (2) people who are neither recovering alcoholics nor recovering drug abusers ('non-recoverings')." <u>Id.</u> at 577; <u>see also</u> <u>Gamble v. City of Escondido</u>, 104 F.3d 300, 306-07 (9th Cir. 1997) ("The relevant comparison

31

group to determine a discriminatory effect on the physically disabled is other groups of similar sizes living together. Otherwise, all that has been demonstrated is a discriminatory effect on group living.").  Framed this way, the plaintiffs could have made a prima facie case of disparate impact

> by providing statistical evidence (1) that x% of all of the recoverings in [the city] need (or have good reason) to live in the "group settings" prohibited by the [ordinance] at issue, (2) that y% of all of the non-recoverings in [the city] need (or have good reason) to live in such group settings prohibited by the [ordinance], and, crucially, (3) that x is significantly greater than y.

Tsombanidis, 352 F.3d at 577; see also Hallmark Developers, Inc. v. Fulton County, 466 F.3d 1276, 1286 (11th Cir. 2006) ("Typically, a disparate impact is demonstrated by statistics.").

Like the plaintiffs in Tsombanidis, Gulf Coast has made no effort to present this kind of evidence.  Indeed, Gulf Coast presented no comparative data at all, relying instead on the bald assumption that because the halfway houses at issue in this case cannot be used for short-term group living, the occupancy-turnover rule must necessarily create a disparate impact on the handicapped.  But simply showing that a few houses are affected by an ordinance does not come close to establishing disparate impact.  See Tsombanidis, 352 F.3d at 576 (explaining that it "is not sufficient for disparate impact purposes" to show only that an ordinance "prevents a handicapped person from living in a particular house"); Gamble, 104

32

F.3d at 306 ("Gamble fails to establish a prima facie case because he has presented no statistics or other proof demonstrating that the City's permit practices have a significantly adverse or disproportionate impact on the physically disabled or elderly."). Because Gulf Coast has completely failed to present relevant comparative evidence, the district court was right to reject its disparate impact claim.[10]

## D.

We turn, finally, to what is left of Gulf Coast's discrimination claim: whether the City violated the FHA's reasonable accommodation provision when it refused to relax the occupancy-turnover rule. Gulf Coast says that the rule must be waived with respect to all six halfway houses, while the City argues that it need not

---

[10] When this lawsuit was filed Treasure Island's Code of Ordinances defined "family" as "one or more persons occupying a dwelling, not more than three of whom are unrelated to each other by birth, adoption or marriage." Code § 68-2. Gulf Coast suggests that, in addition to the occupancy-turnover rule, the City cited it for having too many unrelated people living together. Defining "family" this way, Gulf Coast argues, also results in a disparate impact on the handicapped. We have no occasion to reach the merits of this argument, however, because there is no question that the City of Treasure Island never fined Gulf Coast on account of the number of unrelated people living in the halfway houses. Thus, at the August 10, 2005 hearing before the Code Enforcement Board, Board members and Schwarz's attorney specifically focused on the definition of "tourist dwelling," rather than on the definition of "family." Moreover, at the preliminary injunction hearing before the magistrate judge, the City's attorneys repeatedly stated that the only reason the Board fined Schwarz was because he violated the occupancy-turnover rule. Indeed, one of the City's attorneys acknowledged "that there may be problems with the family definition," but confirmed that Schwarz was "never violated because of the family definition." Preliminary Hearing Tr. at 37 (emphasis added). This case is not about how many unrelated people the City may allow to live together; the issue is, as the City has pointed out consistently, whether the occupancy-turnover rule can be applied lawfully to halfway houses for recovering substance abusers.

33

accommodate any of them. Although we agree that the City does not have to accommodate the two halfway houses located within the RU-75 zones, it may have to accommodate the four halfway houses zoned RM-15. The critical issue concerning the four halfway houses is whether living in them is "necessary" to afford recovering substance abusers an "equal opportunity to use and enjoy" them. 42 U.S.C. § 3604(f)(3)(B). Since the district court did not determine whether there is a genuine issue of material fact on the "necessity" element, we remand only that issue so that it may review the summary judgment record in the first instance.

Starting once again with the language of the statute, the FHA's reasonable accommodation provision prohibits "[1] refusal[s] to make [2] reasonable accommodations in rules, policies, practices, or services, when such accommodations [3] may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B). We address refusal, reasonableness, and necessity -- the three elements of a reasonable accommodation claim -- in that order.

1.

Refusal. As the United States District Court for the District of Hawaii explained,

> the duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an

34

accommodation made. Defendants must instead have been given an opportunity to make a final decision with respect to Plaintiffs' request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law.

Prindable v. Ass'n of Apt. Owners, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003) (citations, quotation marks, alteration, and ellipsis omitted), aff'd sub nom. DuBois v. Ass'n of Apt. Owners, 453 F.3d 1175 (9th Cir. 2006).  In other words, the City "cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary."  Keys Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1275 (10th Cir. 2001); accord Tsombanidis, 352 F.3d at 579 ("A governmental entity must know what a plaintiff seeks prior to incurring liability for failing to affirmatively grant a reasonable accommodation.").  Simply put, a plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA.  Cf. Gaston v. Bellingrath Gardens & Homes, Inc., 167 F.3d 1361, 1363-64 (11th Cir. 1999) (holding that an employee must request an accommodation and be denied prior to bringing a reasonable accommodation claim under Title I of the ADA); Wood v. President & Trs. of Spring Hill Coll., 978 F.2d. 1214, 1222 (11th Cir. 1990) (reaching the same conclusion under the Rehabilitation Act).

35

Prior to suing the City, Gulf Coast never requested an accommodation or explained to the City why it needed an accommodation. Indeed, at the August 10, 2005 hearing before the Code Enforcement Board, rather than request an accommodation, Schwarz's attorney argued that Schwarz was already in compliance with the occupancy-turnover rule. So when it filed this lawsuit in the district court, Gulf Coast had not been "refused" a reasonable accommodation. That would normally be fatal to the claim, but during the preliminary injunction hearing, the City and Gold Coast agreed (at the magistrate judge's suggestion) to discuss a compromise. Accordingly, Gulf Coast submitted a formal reasonable accommodation request asking the City to relax the occupancy-turnover rule as to the six halfway houses, the parties discussed it, and the City ultimately rejected it. At that point, Gulf Coast had been "refused" an accommodation. Indeed, the City has not argued on appeal that Gulf Coast never made a reasonable accommodation request. Thus, this element is satisfied.[11]

---

[11] Several courts have held that if there is a local procedure (such as a variance process) through which the plaintiffs can obtain the accommodations they want, they must use that procedure first and come away unsatisfied prior to filing suit in federal court. See, e.g., Tsombanidis, 352 F.3d at 578 ("To prevail on a reasonable accommodation claim, plaintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question."); Oxford House-C, 77 F.3d at 253 ("[The plaintiffs'] refusal [to apply for a variance] is fatal to their reasonable accommodation claim. The [plaintiffs] must give the City a chance to accommodate them through the City's established procedures for adjusting the zoning code."); United States v. Vill. of Palatine, 37 F.3d 1230, 1233 (7th Cir. 1994) (holding that a reasonable accommodation claim is not ripe until the plaintiff requests an accommodation and is denied). But here the City does

2.

Reasonableness. Neither the Supreme Court nor this Court has explained when it is reasonable to require a local government to alter or bend a zoning ordinance to accommodate the disabled. The FHA regulations also have nothing to say on the matter.[12] Nevertheless, we do not paint on a completely blank canvas because Congress imported the reasonable-accommodation concept from case law interpreting the Rehabilitation Act. See H.R. Rep. 100-711, 1988 U.S.C.C.A.N. 2173, 2186 & n.66 ("The concept of 'reasonable accommodation' has a long history in regulations and case law dealing with discrimination on the basis of handicap.") (citing Se. Cmty. Coll. v. Davis, 442 U.S. 397 (1979), a Rehabilitation Act case, and 45 C.F.R. § 84.12, a Rehabilitation Act regulation); United States v. Cal. Mobile Home Park Mgmt. Co., 29 F.3d 1413, 1416 (9th Cir. 1994) ("Congress based the FHAA's reasonable accommodations provision on the regulations and case law dealing with discrimination on the basis of handicap

_____

not argue that there were any local procedures available to Gulf Coast, and, therefore, we have no occasion to address the matter.

[12] The omission was deliberate. The Department of Housing and Urban Development is the primary agency responsible for enforcing the FHA, and it has promulgated regulations interpreting the Act. But the statute requires HUD to refer all cases involving "the legality of any State or local zoning or other land use law or ordinance" to the Department of Justice. 42 U.S.C. § 3610(g)(2)(C). Because it "has no power to issue a charge of discrimination in matters involving zoning or other land use law," HUD decided not to address when modifications of public land use regulations are required under the FHA. Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3246 (Jan. 23, 1989).

37

under section 504 of the Rehabilitation Act . . . .") (quotation marks omitted).

Moreover, Congress included the reasonable-accommodation concept throughout the Americans with Disabilities Act, and we have applied that statute's reasonable-accommodation requirements on numerous occasions. So we look to case law under the RA and the ADA for guidance on what is reasonable under the FHA.

Starting with the Rehabilitation Act, an "[a]ccommodation is not reasonable if it either [1] imposes undue financial and administrative burdens on a grantee or [2] requires a fundamental alteration in the nature of the program." Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 288 n.17 (1987) (quotation marks, alteration, and citations omitted); Harris v. Thigpen, 941 F.2d 1495, 1527 n.48 (11th Cir. 1991); see also Alexander v. Choate, 469 U.S. 287, 300 (1985) (explaining that, under the Rehabilitation Act, "a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped"); Se. Cmty. Coll., 442 U.S. at 410 (holding that the Rehabilitation Act does not require "fundamental alteration[s] in the nature of a program"). The City does not argue that waiving the occupancy-turnover rule would impose any undue financial or administrative burden. Rather, the City says that relaxing the occupancy-turnover rule in RM-15 and RU-75 zoning districts would cause a "fundamental alteration" in its long-standing zoning scheme.

38

As we have often noted in employment cases arising under the ADA, a proposed accommodation amounts to a "fundamental alteration" if it would eliminate an "essential" aspect of the relevant activity.  E.g., Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1256 (11th Cir. 2007) ("An accommodation is 'reasonable' and necessary under the ADA . . . only if it enables the employee to perform the essential functions of the job."); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1259-60 (11th Cir. 2001) (same).  Indeed, in PGA Tour, Inc. v. Martin, the Supreme Court held that Title III of the ADA required the PGA Tour to allow Casey Martin to use a golf cart during tournaments because the Tour's walking rule was "at best peripheral to the nature of [its] athletic events," rather than "an essential rule of competition."  532 U.S. 661, 689 (2001); see also Se. Cmty. Coll., 442 U.S. at 410 (concluding that requiring a nursing program to waive all clinical requirements for a deaf applicant would amount to a fundamental alteration of the program).  Applying that test to our facts, we are required to determine whether the occupancy-turnover rule is "essential" to Treasure Island's RM-15 and RU-75 zoning districts.

Whether a particular rule is "essential" to a zoning scheme will, of course, turn on the facts of each case, but a few general principles guide us.  The basic purpose of zoning is to bring complementary land uses together, while separating

39

incompatible ones.  See Vill. of Euclid v. Ambler Realty Co., 272 U.S. 365, 388 (1926) ("A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard.").  Thus, ordering a municipality to waive a zoning rule ordinarily would cause a "fundamental alteration" of its zoning scheme if the proposed use was incompatible with surrounding land uses.  See Bryant Woods Inn, Inc. v. Howard Cty., 124 F.3d 597, 604 (4th Cir. 1997) ("In determining whether the reasonableness requirement has been met, a court may consider . . . the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations . . . .").  On the other hand, if the proposed use is quite similar to surrounding uses expressly permitted by the zoning code, it will be more difficult to show that a waiver of the rule would cause a "fundamental alteration" of the zoning scheme.  Similarly, if the municipality routinely waives the rule upon request, it will be harder to show that the rule is "essential."

A few examples help make sense of these general principles.  In Hovsons, Inc. v. Township of Brick, 89 F.3d 1096 (3d Cir. 1996), a developer wanted to construct a nursing home in a residential area, but the municipality's zoning code forbade nursing homes in each of its fifteen residential zones.  "Planned residential retirement communities," however, were permitted uses as of right.  Id. at 1099.

The Third Circuit concluded that allowing the developer to build a nursing home in a residential zone would not be a "fundamental alteration" of the zoning code because the proposed facility was "similar to that of the local planned residential retirement communities[.]" Id. at 1105; see also id. at 1098 (explaining that the "density, architecture and design features of the proposed development are comparable to that of the surrounding planned retirement communities").  By contrast, in Bryant Woods Inn the operator of a group home for elderly residents suffering from Alzheimer's and dementia sought a variance allowing it to expand the home from eight to fifteen residents.  After the local zoning board denied the request, concluding that the expansion would only worsen already-prevalent parking congestion on streets near the facility, the operator sued.  The Fourth Circuit found no violation of the reasonable-accommodation requirement because the zoning board's concerns about parking congestion were justified.  See 124 F.3d at 604.  In other words, the proposed expansion was incompatible with the surrounding area because of the congestion it would cause.

        With these principles in mind, we turn to the facts of this case, starting with the two halfway houses located in the RU-75 zones.  Again, these zones allow only single-family residential dwellings and forbid tourist dwellings.  The definition of "tourist dwelling" provides:

41

> if a single-family dwelling located in the RU-75 land use district is operated or used in such a way that it has a turnover in occupancy of more than two times in any one year, it shall create a rebuttable presumption that such single-family dwelling is a tourist dwelling.

Code § 68-2.

By limiting RU-75 zones to single-family homes that, in general, may change occupancy no more than two times per year, the City plainly intended to create pockets of stable, single-family neighborhoods.

The Supreme Court has squarely held that localities have a legitimate interest in creating single-family neighborhoods "where family values, youth values, and the blessings of quiet seclusion and clear air make the area a sanctuary for people." Vill. of Belle Terre, 416 U.S. at 9. As the Supreme Court of Pennsylvania, among others, has observed, low turnover may be an essential aspect of such neighborhoods:

> [O]ne of the many benefits of single-family zoning districts is that they create residential neighborhoods in which the residents may develop a sense of community and a shared commitment to the common good of that community. Without some level of stability and permanence in the composition of the groups residing in such residential districts, this goal is necessarily subverted.

Albert v. Zoning Hearing Bd. of N. Abington Twp., 854 A.2d 401, 409 (Pa. 2004); accord Ames Rental Prop. Ass'n v. City of Ames, 736 N.W.2d 255, 260 (Iowa 2007) ("Quiet neighborhoods with a stable population . . . are laudable goals.");

42

Dinan v. Bd of Zoning Appeals, 595 A.2d 864, 870 (Conn. 1991) (explaining that the transiency of short-term tenants "is not as likely to stimulate on their part similar concerns about the about the quality of living in the neighborhood for the long term"); City of White Plains v. Ferraioli, 313 N.E.2d 756, 758 (N.Y. 1974) ("So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance.") (emphasis added; citation omitted); see also State v. Champoux, 566 N.W.2d 763, 768 (Neb. 1997) (listing "low transiency" as a "legitimate objective[]" of residential zoning); Douglas W. Kmiec, I ZONING & PLANNING DESKBOOK § 5:18, at 5-68 (2d ed. 2008) ("One of the main factors that all courts consider in deciding whether group homes or non-'family' uses are permissible under the zoning ordinance is the stability of the home in relation to the neighborhood.") (emphasis added).

Not surprisingly, the City stresses the importance of low turnover to its RU-75 districts, and its Code suggests that this is not merely a litigating position. Specifically, the City's Planning and Zoning Board has the power to grant a variance where "literal enforcement of the provisions of the land development regulations will result in unnecessary hardship" and a variance "will not be contrary to the public interest." Code § 70-9(d). But "[u]nder no circumstances

shall the planning and zoning board or city commission grant a variance to permit a use not generally or by special exception permitted in the land use district involved or any use expressly or by implication prohibited by the land development regulations." Id. § 70-221(g). "Tourist dwellings" such as the halfway houses are expressly listed as permitted uses in RFM-30, RFH-50, and CG zones, but they are not listed as permitted uses in RU-75 zones. Therefore, tourist dwellings are, at minimum, prohibited "by implication" in RU-75 zones, which means that neither the Planning and Zoning Board nor the City Commission may authorize them. Because not even the local officials empowered to grant variances have sufficient authority to allow a high-turnover tourist dwelling in an RU-75 zone, it is fair to say that the City of Treasure Island (like so many other local communities) views stability and low turnover as an essential aspect of those zoning districts.

Although by no means dispositive, we think Treasure Island's views about what is essential to its zoning districts must be considered in our analysis. "[R]egulation of land use is perhaps the quintessential state activity." FERC v. Mississippi, 456 U.S. 742, 767 n.30 (1982). State and local officials have experience in these areas and know best the needs of their citizenry. We doubt Congress meant for the federal courts to ignore entirely the considered judgments of these officials when deciding what is reasonable in a particular case. See

44

Oxford-House-C, 77 F.3d at 253 ("In our view, Congress also did not intend the federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the first instance.").  Moreover, Title I of the ADA -- which Congress passed just two years after adding the disabled as a protected class under the FHA -- directs courts to consider "the employer's judgment as to what functions of a job are essential" when examining reasonable accommodation claims in the employment context.  42 U.S.C. § 12111(8).  If employers' views on what is essential about a job are relevant, then surely local officials' views on what is essential about their zoning districts are at least as relevant as well.

Given Treasure Island's considered judgment on the importance of stability in RU-75 zones, the recognition other courts have afforded the value of stability in single-family residential neighborhoods, and the deference we normally accord to local land use regulation, we have little trouble concluding that limited turnover is an essential aspect of the RU-75 zones.  And there can be no doubt that Gulf Coast's two halfway houses in RU-75 zones undermine that low-turnover policy.  Average stays at the halfway houses last some six to ten weeks, a level that far exceeds the turnover courts have found unacceptably high for single-family residential neighborhoods.  See, e.g., Albert, 854 A.2d at 410 (holding that an average stay of two to six months was too transient for a single-family residential

45

district); Ferraioli, 313 N.E.2d at 758 (explaining that "temporary living arrangement[s]" of a "year or so" would exhibit "none of the permanency of community that characterizes a residential neighborhood of private homes"). Moreover, such rapid turnover dwarfs the two turnovers per year that Treasure Island has deemed the presumptive maximum for RU-75 zones. Accordingly, we hold that relaxing the occupancy-turnover rule to accommodate the two halfway houses in the RU-75 zones would amount to a "fundamental alteration" of Treasure Island's zoning scheme, and, therefore, that Gulf Coast's reasonable accommodation claim concerning the properties at 10214 Tarpon Drive and 10101 Tarpon Drive must fail.

But the other four halfway houses (12305 3rd Street East, 12275 3rd Street East, 250 115th Avenue, and 10399 Paradise Boulevard), which are all located within RM-15 zones, are another matter. To repeat, RM-15 zones, like RU-75 zones, forbid tourist dwellings; but unlike RU-75 zones, RM-15 zones allow multi-family dwellings. The Code, however, says a "tourist dwelling" means a "single-family or two-family dwelling" that meets the occupancy-turnover criteria. By its express terms, then, the definition of "tourist dwelling" does not include multi-family dwellings, and, therefore, the occupancy-turnover rule embodied in the definition of "tourist dwelling" does not apply to multi-family dwellings.

46

In other words, as Gulf Coast argues and the City does not contest, under the express terms of the City's Code, no occupancy-turnover limit applies to multi-family dwellings. See Belair v. City of Treasure Island, 611 So.2d 1285, 1289 (Fla. Dist. Ct. App. 1992) (holding that, under the plain meaning of the City's zoning ordinances, a single unit within a large condominium complex cannot be a "tourist dwelling"). It necessarily follows that because the City of Treasure Island allows multi-family dwellings in RM-15 zones, Gulf Coast could operate a halfway house in a multi-family dwelling in an RM-15 zone. The only effect the occupancy-turnover rule has in RM-15 zones, then, is to prevent Gulf Coast from operating high-turnover halfway houses in the single-family houses it currently occupies.[13]

Although the City still argues that, just like in RU-75 zones, low turnover is an important aspect of RM-15 zones, we do not see how it can be "essential" since numerous dwellings in those zones are not subject to the same occupancy-turnover limits. In Tsombanidis, for example, the owner of a halfway house for recovering substance abusers was cited for housing too many unrelated residents in violation of the municipality's definition of "family," which limited the number of unrelated

---

[13] Notably, Schwarz described one of his halfway houses in the RM-15 zones as "an eight-unit apartment structure." See note 2, supra. Under the plain language of the ordinance and Belair, it appears that the definition of "tourist dwelling" does not even apply to this halfway house.

47

(but not the number of related) people that could live together. Thus, seven people could live in a house if they were related, but seven unrelated people could not live together in the same house. Although the Second Circuit acknowledged that "legitimate concerns of residential zoning laws include the integrity of the City's housing scheme and problems associated with large numbers of unrelated transient persons living together, such as traffic congestion and noise," it nevertheless concluded that the failure to grant a variance violated the FHA's reasonable accommodation provision because the municipality "point[ed] to no evidence that those concerns were present here." 352 F.3d at 580.

Treasure Island's occupancy-turnover rule suffers from the same underinclusiveness as the definition of "family" at issue in Tsombanidis. Under the City's rule, two dwellings across the street from each other could have the same turnover rate, yet one would be lawful and the other unlawful simply because one dwelling is a single-family house and the other is a unit in a condominium complex. Similarly, in Tsombanidis, two houses across the street from each other could each have seven people living in them yet the residents of one were considered law-abiding citizens and residents of the other scofflaws based solely on whether they were related to their roommates. Although a rule that results in so haphazard a pattern may be rational, on this summary judgment record, we do not

48

see how it can be considered "essential" to the zoning scheme in the absence of <u>any</u> facts justifying it, and the City has presented none. <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1217 (11th Cir. 2000) ("'[O]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial.'") (quoting <u>Gossett v. Du-Ra-Kel Corp.</u>, 569 F.2d 869, 872 (5th Cir. 1978)).

Indeed, because Gulf Coast wants to use its properties in the same manner as it could use a dwelling across the street, the argument for requiring an accommodation is even more compelling here than it was in <u>Hovsons</u>. There, the developer sought permission for a land use that was "similar" to uses already permitted. 89 F.3d at 1105. Gulf Coast, on the other hand, seeks only to use its houses in the <u>same</u> manner as it could use an apartment building next door. For these reasons, on the undisputed facts, we conclude that the low-turnover rule embodied in the definition of "tourist dwelling" is not an "essential" aspect of RM-15 zones. Therefore, Gulf Coast's request to relax the occupancy-turnover rule as to its properties located at 12305 3rd Street East, 12275 3rd Street East, 250 115th Avenue, and 10399 Paradise Boulevard was reasonable, and we direct the district court on remand to enter partial summary judgment in favor of Gulf Coast on the "reasonableness" element of its reasonable accommodation claim concerning these

four houses.

3.

Necessity.  But Treasure Island would be required to make that reasonable accommodation only if it "may be necessary to afford [Gulf Coast clients an] equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).  The district court concluded that Gulf Coast could not satisfy this element because it could operate high-turnover halfway houses in Treasure Island's RFM-30, RFH-50, and CG zones.  We reject this rationale because reasonable accommodation analysis asks whether a handicapped person must be accommodated in the dwelling of his choice, rather than at another location in the municipality.  But the necessity element does require Gulf Coast to show that living in the halfway houses addresses a need caused by residents' addiction.  Because the district court did not review the record to determine whether a genuine issue of material fact exists about whether the halfway houses are "necessary" in this sense, we are required to remand for further proceedings only on this issue.

Although Gulf Coast may operate halfway houses in other areas of Treasure Island, the essential question in reasonable accommodation cases is whether the handicapped have an equal opportunity to live in the dwellings of their choice, not simply an opportunity to live somewhere in the City.  The language of the statute

50

suggests as much by requiring an "equal opportunity to use and enjoy <u>a dwelling</u>,"

42 U.S.C. § 3604(f)(3)(B) (emphasis added), rather than an equal opportunity to

live in <u>a city</u>. See <u>Erdman v. City of Ft. Atkinson</u>, 84 F.3d 960, 963 (7th Cir. 1996)

("In our case, the district court concluded that what the plaintiffs must show is

inequality of opportunity to live in the <u>city</u> of Fort Atkinson. We express

skepticism about that interpretation of a statute which refers specifically to

inequality of opportunity to live in a <u>dwelling</u> . . . ."). And the House Report

accompanying the FHAA could not be clearer on this point:

> The Act is intended to prohibit the application of special requirements
> through land-use regulations, restrictive covenants, and conditional or
> special use permits that have the effect of limiting the ability of such
> individuals to live in the residence <u>of their choice</u> in the community.

1988 U.S.C.C.A.N. 2173, 2185 (emphasis added).

We therefore conclude that the availability of another dwelling somewhere

within the City's boundaries is irrelevant to whether local officials must

accommodate recovering substance abusers in the halfway houses of their choice.

See <u>Howard v. City of Beavercreek</u>, 276 F.3d 802, 806-07 (10th Cir. 2002)

(analyzing whether the requested accommodation was necessary to afford the

plaintiff an "equal opportunity to enjoy the housing . . . of his choice"); <u>Hovsons</u>,

89 F.3d at 1103 (rejecting argument that township reasonably accommodated

plaintiff by allowing construction of a nursing home in another area of town).[14]

Although we reject the ground relied on by the district court, the City raised an alternative argument that the district court did not have occasion to reach -- an accommodation is not "necessary to afford [recovering substance abusers] equal opportunity to use and enjoy a dwelling," 42 U.S.C. § 3604(f)(3)(B), because the six halfway houses do not ameliorate any needs caused by their handicaps. We agree that § 3604(f) plainly requires the plaintiffs to show that the accommodation they requested actually alleviates the effects of a handicap.

To explain why, we turn, once again, to the language of the statute. The FHA's reasonable accommodation provision requires only those accommodations that "may be <u>necessary</u> . . . to afford <u>equal</u> opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B) (emphases added). The word "equal" is a relative term that requires a comparator to have meaning. In this context, "equal opportunity" can only mean that handicapped people must be afforded the same (or "equal") opportunity to use and enjoy a dwelling as non-handicapped people, which occurs when accommodations address <u>the needs created by the handicaps</u>.

---

[14] We have no occasion to address whether the availability of other suitable dwellings is relevant to <u>disparate impact</u> claims, assuming they are viable under § 3604(f). <u>See</u> <u>Brandt v. Vill. of Chebanse</u>, 82 F.3d 172, 174 (7th Cir. 1996) (explaining that a municipality's offer "to permit a variance elsewhere within its borders . . . assuredly defeats any claim that the Village's policies have a disparate impact on the handicapped").

If accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an "equal," but rather a better opportunity to use and enjoy a dwelling, a preference that the plain language of this statute cannot support. See Wisconsin Cmty. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 749 (7th Cir. 2006) (en banc) ("[T]he statute requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market."); Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains, 284 F.3d 442, 460 (3d Cir. 2002) ("[I]f the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary.") (quotation marks omitted); Bryant Woods Inn, 124 F.3d at 604 ("The FHA does not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap."); Forest City Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 152 (2d Cir. 1999) (explaining that the relevant inquiry is whether "the non-complying features of the proposed residence are 'necessary' in light of the disabilities of proposed residents"). Thus, waiving an ordinance that applies to both handicapped and non-handicapped people may be "necessary" to afford the handicapped an "equal opportunity" if the waiver

53

addresses a need created by the handicap.

In this case, the City has conceded that the halfway-house residents are disabled because of their addictions. In general, the "need" created by a substance addiction is help with breaking that addiction and maintaining sobriety. Therefore, the question becomes whether relatively short-term stays in the halfway houses contribute in a meaningful way to an addict's recovery. See Bryant Woods Inn, 124 F.3d at 605 (concluding that a municipality need not allow a group home to expand because there was "no evidence . . . that expansion from 8 to 15 residents would be therapeutically meaningful"); Smith & Lee, 102 F.3d at 795-96 (concluding that group homes were "necessary" for the elderly because they "often provide the only means by which this population can continue to live in residential neighborhoods"). Gulf Coast has contended throughout the litigation that living in halfway houses is absolutely essential in many cases, but the City vehemently disagrees.

The district court did not reach this issue because it concluded that the availability of other dwellings in the City of Treasure Island meant that the requested accommodations were not "necessary" within the meaning of the statute.[15] But because we have rejected this interpretation of § 3604(f), we could

---

[15] To be sure, the district court observed in passing that "[t]he parties agree that recovering addicts benefit therapeutically when they live together as a collective group."

54

only affirm the district court's grant of summary judgment to the City if no reasonable jury could conclude that the halfway houses at issue here provide therapeutic benefits necessary to their residents. See Fed. R. Civ. P. 56(c); Tullius v. Albright, 240 F.3d 1317, 1320 (11th Cir. 2001) ("If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.") (quotation marks omitted).

Unfortunately, the parties' briefs address this issue only in passing. But our review of the record reveals that there may be a genuine issue of material fact about "necessity." In the district court, Gulf Coast relied on (1) residents' testimony about the benefits of group living; (2) the preliminary injunction testimony of Dianne Allen, Gulf Coast's Clinical Director, who opined that the halfway houses, among other things, enable Gulf Coast to achieve an 80% recovery rate, far exceeding other treatment methods; (3) the expert opinion of Dr. Michael Maher, who explained the therapeutic benefits of group living for recovering substance abusers; and (4) a series of federal decisions addressing the efficacy of group living arrangements for recovering substance abusers. See, e.g.,

---

Schwarz, 521 F. Supp. 2d at 1322. But in a footnote, the district court added that "Defendants do argue . . . that recovering substance abusers who 'need' residential housing are not appropriate for outpatient treatment." Id. at 1323 n.12. We do not read this brief reference to therapeutic benefits as resolving whether a genuine issue of material fact exists about "necessity."

Connecticut Hosp., 129 F. Supp. 2d at 132; Oxford House, Inc. v. Town of

Babylon, 819 F. Supp. 1179, 1185 (E.D.N.Y. 1993).[16]

The City acknowledges these decisions, but argues that the halfway houses

in this case do not offer therapeutic benefits, let alone that they are necessary to

help an addict break his addiction and maintain sobriety.  Specifically, the City

notes that Ms. Allen's 80% figure relied entirely on self-reporting, and that Allen's

estimates, by her own admission, were not based on "official" or "statistical"

research.  Allen Dep. (Doc. 188) at 132.   Moreover, Gulf Coast's own expert, Dr.

Maher, acknowledged that a stable environment aids recovery, and that a high

turnover rate among occupants of a halfway house could be counterproductive.

Indeed, although he opined that the halfway houses in this case would be good

places to live, Dr. Maher conceded that he had "not made any specific assessment

of a particular residence or the stability of that residence with regard to . . . group

and relationship issues."  Maher Dep. (Doc. 180) at 62.  Finally, the City's expert,

Dr. Joseph Molea, an addiction specialist, testified at his deposition that the

---

[16] Congress has also endorsed group homes as a tool in the fight against addiction. Specifically, the federal government gives the states block grants to fight substance abuse.  The statute regulating states' use of this federal money expressly allows them to use their grants to "establish and maintain the ongoing operation of a revolving fund . . . to support group homes for recovering substance abusers[.]"  42 U.S.C. § 300x-25(a).  "The purpose of the fund is to make loans for the costs of establishing programs for the provision of housing in which individuals recovering from alcohol or drug abuse may reside in groups of not less than 6 individuals," and these group homes must operate under rules similar to the "Property Rules" Schwarz included in the leases on the properties in this case.  Id. § 300x-25(a)(1).

56

halfway houses offered <u>no</u> therapeutic benefit to their residents, on the theory that if a patient's living arrangement was relevant to his recovery, then that patient should be in residential treatment, rather than in Gulf Coast Recovery's outpatient program. Dr. Molea also questioned whether the short stays of Gulf Coast patients rendered their treatment ineffective, citing a monograph by the National Institute on Drug Abuse that states: "[R]esearch has shown unequivocally that good outcomes are contingent on adequate lengths of treatment. Generally, for residential or outpatient treatment, participation for less than 90 days is of limited or no effectiveness . . . ." Molea Dep. (Doc. 195) Ex. 4 at 1802.

Because the district court never addressed the issue and the parties' arguments on appeal did not focus on it, we remand this matter to the district court so that it can, with the assistance of the parties, conduct a full review of the present record, and any additional evidence the district court may permit the parties to present. If the district court concludes there is a genuine issue of material fact, then the issue of "necessity" must proceed to trial. If the district court concludes otherwise, then it may proceed to the entry of final summary judgment.

III.

That concludes the heavy lifting in this case. We turn, then, to the remaining issues: (1) whether the district court erred in granting summary

57

judgment to the City on Gulf Coast's due process claim; and (2) whether the district court abused its discretion in denying Gulf Coast leave to supplement its amended complaint. We affirm both determinations.

First, Gulf Coast argues that Schwarz was denied due process at the August 10 and August 25, 2005 Code Enforcement Board hearings because he did not have an opportunity to cross-examine witnesses and because the Board's attorney questioned witnesses and commented on evidentiary matters. These arguments are meritless.

We have reviewed thoroughly the transcripts of the hearings and agree with the district court's conclusion that "Schwarz's counsel was provided sufficient opportunity to cross-examine witnesses and enter evidence." Schwarz, 521 F. Supp. 2d at 1324. Indeed, the Board limited Schwarz's attorney only when he questioned witnesses about irrelevant matters. Much like trial courts, local enforcement boards are not required to sit through endless questioning that has no bearing on the issues.

Likewise, there is nothing wrong with Board members -- who are laymen -- allowing their attorney advisor to ask questions on their behalf and to advise them on evidentiary issues. Everything the Board's attorney said could have been said by the Board members themselves. Thus, we cannot see how the Board violated

Schwarz's due process rights by delegating certain tasks to its attorney. Indeed, the Board's Chairman succinctly made this common-sense point in response to one of Schwarz's many objections:

> These questions could have easily been given to me in typewritten form. And I could have been asking. I've asked the city attorney to ask these questions because they need to be asked.

Doc. 178, Ex. X at 6.

Cherry Communications, Inc. v. Deason, 652 So.2d 803 (Fla. 1995), on which Schwarz relies heavily, does not suggest a different result. In that case, the same attorney served as prosecutor during the hearing and then submitted ex parte memoranda to the Commission that commented on evidence in the record. See id. at 805. There were no ex parte communications here, and, although the Board's attorney questioned witnesses, she did so on the Board's behalf. There was no due process violation under Deason or any other standard.

Second, more than a year after it filed this lawsuit, Gulf Coast attempted to supplement its complaint with claims arising from Treasure Island's refusal to allow Schwarz and Gulf Coast Recovery to open a residential treatment facility. The City argued that the tardy request to supplement was intended to delay an impending trial date, and the district court denied leave. Whether federal law requires the City to allow Schwarz and Gulf Coast to operate a new residential

59

treatment facility is an entirely separate matter from whether the City must accommodate the halfway houses. And the operation of the halfway houses was the only issue raised in the amended complaint. The district court did not abuse its discretion by refusing to allow Gulf Coast to expand the scope of its lawsuit by asserting an entirely new theory of recovery at so late a date, particularly where discovery was already well underway and Gulf Coast could raise the new claims in another lawsuit. See, e.g., Cason v. Seckinger, 231 F.3d 777, 787 (11th Cir. 2000) (concluding that the district court did not abuse its discretion in denying leave to amend because, among other things, the plaintiffs could bring the claims in another lawsuit); Burger King Corp. v. Weaver, 169 F.3d 1310, 1319 (11th Cir. 1999) (no abuse of discretion to deny a delayed amendment that would have added a new theory to the case).

IV.

In sum, we affirm the grant of summary judgment to the City on Gulf Coast's disparate treatment, disparate impact, equal protection, and due process claims, and affirm the denial of leave to supplement the complaint. We also affirm the entry of summary judgment for the City on Gulf Coast's reasonable accommodation claim with respect to 10214 Tarpon Drive and 10101 Tarpon Drive, the two halfway houses located in the City's RU-75 zones. But as to the

60

reasonable accommodation claim based on the four houses in RM-15 zones (250 115th Avenue, 10399 Paradise Boulevard, 12275 3rd Street East, and 12305 3rd Street East), we vacate the order of summary judgment and remand for the district court (1) to enter partial summary judgment in favor of Gulf Coast on the "reasonableness" element of that claim, and (2) to determine whether a genuine issue of material fact exists about whether the requested accommodation may be "necessary" to afford recovering substance abusers an "equal opportunity to use and enjoy" the halfway houses, 42 U.S.C. § 3604(f)(3)(B).

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**